37809. KRIER v. THE STATE.

SMITH, Justice.

Appellant, Wayne Ladd Krier, was indicted for the stabbing murder of Teresa Lavin. The jury found him guilty and also found that the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim and recommended that the death penalty be imposed. The case is here on direct appeal and for

mandatory review of the death sentence. We affirm.

1. In his first two enumerations of error, appellant contends that the trial court erred in denying his motion to exclude his confession. He claims a violation of his Miranda rights under Edwards v. Arizona, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981), as well as a lack of probable cause to arrest at the time of the issuance of the arrest warrant.

a) In Edwards v. Arizona, supra, the U. S. Supreme Court held "that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id. at 484. The court also held that "an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. We do not believe Edwards renders the confessions obtained in the instant case inadmissible.

Appellant was arrested in New Orleans at the request of Georgia authorities. The evidence is in conflict as to whether he exercised his right to remain silent, requested an attorney, or waived his rights. The following day, Georgia authorities arrived in New Orleans and went to the jail where appellant was being held. He was informed of his rights and signed a waiver. At this time, appellant was questioned about the whereabouts of one Daniel Cody, who had accompanied him to the victim's apartment complex. Appellant was not questioned as to his participation in the crime.

Counsel was appointed to represent appellant at his extradition hearing. Extradition was waived and appellant was brought back to Georgia. Upon his return, appellant was again advised of his rights, waived them, and made both a written and oral confession. These statements were introduced against him at trial.

From these facts, it is apparent that the instant case is distinguishable from Edwards in several important respects. First, it is not undisputed that appellant made a request for counsel while in the custody of New Orleans authorities. In addition, the confessions were obtained after appellant had been placed in the custody of Georgia authorities and brought back to this state, after extradition counsel had been discharged and appellant had been informed that he was entitled to counsel in Georgia, and after appellant had twice signed written waivers of his Miranda rights. See *Cervi v. State,* 248 Ga. 325 (282 SE2d 629) (1981); see also People v. Bartolomeo, 53

NY2d 933 (440 NYS2d 927) (1981). In our view it would be unreasonable to hold that an assertion of rights in the asylum state (assuming one occurred) operated to prevent any further inquiry by authorities in the requesting state as to whether the accused would like to speak to them, where the requesting authorities reasonably understood that no request for counsel had been made.

Finally, unlike Edwards, there is no doubt that appellant's confessions were obtained only after the "intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U. S. 458, 464 (58 SC 1019, 82 LE 1461) (1938). One of the investigators in the case testified that appellant "opened up almost instantly." Appellant detailed his crime to authorities on a number of occasions, and he provided a lengthy confession at the trial of his case.

We find no error under Edwards.

b) Probable cause for the issuance of an arrest warrant consisted of the following: Appellant and a co-worker went to the victim's apartment complex and signed in with the guard at 1:55 p.m. They signed out at 2:08 p.m. A next-door neighbor of the victim heard noises coming from the apartment and estimated the time to be approximately 2:30 p.m. (Appellant had returned to the apartment about 2:15 p.m., but this was unknown to police until the day after the warrant was issued.) The police also knew at the time the warrant was issued that appellant had not returned the borrowed car he was driving, had not returned to work, nor had anyone seen him since the afternoon of the murder. The police thought that the neighbor was in error as to the time, since all the other known facts pointed to appellant.

Appellant does not argue that any testimony given to the issuing magistrate was false. Rather, he contends that probable cause to arrest could not exist because of the "inconsistency" between the neighbor's testimony as to when he heard noises coming from the victim's apartment and the sign-out time stated in the apartment guard's log.

We must agree with the trial court's conclusion that the arrest warrant was based upon probable cause. Notwithstanding the minor inconsistency referred to above, the evidence presented to the issuing magistrate was such as would lead a reasonably cautious person to believe that appellant had committed the offense. Hance v. State, 245 Ga. 856 (268 SE2d 339) (1980).

2. Appellant also contends that the trial court impermissibly curtailed his right to cross examination in the course of pre-trial hearings and that this curtailment hindered his efforts in establishing a lack of probable cause to arrest. The record, however, shows that the basic facts relating to the existence of probable cause

were stipulated, that appellant had been afforded extensive cross examination, and that the trial court's decision to deny appellant further cross examination was made at a time when further cross examination would have been pointless.

"The scope of cross examination lies largely within the discretion of the trial court. It will not be disturbed by this court unless it is shown there has been an abuse of that discretion. No such abuse is disclosed by this record." *Davis v. State,* 230 Ga. 902, 904 (199 SE2d 779) (1973).

The propriety of the trial court's action in the case at bar is highlighted by appellant's subsequent "offer of proof" as to what further cross examination would show. The offer included nothing that had not already been stipulated or established through testimony.

3. In his fourth enumeration of error, appellant contends that the trial court erred in excluding a juror as being unalterably opposed to capital punishment.

The following transpired on voir dire:

"Q. Are you conscientiously opposed to capital punishment?

A. I am.

Q. You are conscientiously opposed?

A. Yes.

The Court: Let me ask you some questions. Ms. Henry, are your reservations about the death penalty or capital punishment such that you could never impose the death penalty, regardless of the evidence and the instructions of the Court.

A. I wouldn't say never.

The Court: Are there some circumstances in some cases then in which you would impose the death penalty?

A. I believe I could.

Q. So, Ms. Henry, when you said to my question it was just out of the blue, and I realize that, that you were conscientiously opposed to the death penalty, is what you meant that you have serious reservations about it?

A. Yes, I do.

Q. Well, in this case, Mr. Krier is charged with the offense of murder for killing an individual with a knife, and you, of course, have not heard any of the evidence in the case, can you say whether or not you would, it is possible that you could, if the circumstances and law warranted it, is it possible that you could vote for a death in this case?

A. I don't think so.

Q. If you would, please, ma'am, I'm just trying to find out exactly what your feelings are. How do you distinguish this particular case, the one that you would sit on as a juror, as compared to what the

Court asked you about, if you could impose the death penalty in some circumstances?

Ms. Henry: Will you rephrase that?

The Court: What he is getting at, I asked you if your reservations about the death penalty was such that you could never impose the death penalty and you said no, and you said there were some instances in which you could impose the death penalty. Not knowing anything about this case about which you are about to try, in answer to the question Mr. Peters just asked you, you said that you didn't think that you could impose it in this case. What we are wondering is how do you know you can or can't or you could impose it in this case?

Ms. Henry: I reckon I should say I don't think I could in any case, really.

The Court: Are your own personal feelings such that you could personally never impose the death penalty?

Ms. Henry: I believe so.

The Court: Are you saying that you believe that the death penalty is proper in some cases, but just you could never personally be a part of imposing it?

Ms. Henry: I believe so.

The Court: Well, excuse me for pressing you on this, but is it your position now that you would vote against the death penalty regardless of the facts and evidence presented to you in this case?

Ms. Henry: In this particular case?

The Court: Yes.

Ms. Henry: I really don't think I could ever vote for the death penalty in any case.

The Court: And you have already made up your mind, then, that if this defendant was convicted of this offense, that in that event you would vote to impose life imprisonment solely because of your opposition to the death penalty, is that right?

Ms. Henry: Yes.

The Court: I am going to excuse this juror then for cause . . ."

In our view, the above testimony unequivocally shows that the potential juror would vote against the death penalty regardless of what transpired at trial. Thus, the trial court did not err in excusing her. Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968); *Blankenship v. State,* 247 Ga. 590 (4) (277 SE2d 505) (1981).

4. Appellant asserts that the trial court erred in failing to charge on voluntary manslaughter, as he had requested.

In his initial confession, appellant stated: "[W]hile we were smoking [a] joint, I just reached over and touched her or something . . . [S]he stood up and started hitting me real hard on the chest."

Appellant admitted hitting the girl in response, but could not remember anything else. Later in the interview, however, appellant recalled that "I wasn't mad."

At a later confession, appellant related the events he previously could not remember. He stated that "I put my hand up on her shoulder" and that the victim began "beating on me with the ball of her fist, like my chest was a little drum or something." "I took my hand and kind of both hit and pushed her away at the same time . . . I hit her and when she started coming back at me I took the knife out of my pocket. And you know I didn't intend on using it. I never have. You know, so when she came I took a swing at her — and I hit her with the knife and caught her in the throat . . . I hit her trying to knock her down and knock her out or something, just quiet her down, you know . . ." According to appellant, he then went into the bathroom to wash off, and while there, the victim came at him again. "When she came running at me again I hit her . . . and it cut her again in the face. And then knocked her down, and I took and laid down the knife deliberately because I realized I cut the girl again . . . I took my hand and balled it and I just hit her, trying, almost about trying to knock out a man just so I could leave."

At trial, appellant told a somewhat different story: "I think I called her name or something, I don't remember, and she didn't answer. So I reached up . . . and I grabbed her arm kind of to get her attention more than anything else . . . and she just turned around — and just the look on her face . . . [S]he just kept staring at me, you know, all of a sudden I felt the big complex thing and I slapped her." The victim, who previously had been vacuuming her apartment, had the vacuum cleaner tube "still in her hand and when I hit her she went . . . like she was going to fall . . . but the tube actually stopped her from falling . . . [W]hen she came back she swung with the tube . . . I took the knife out and said . . . stay away from me. I swung the knife and the knife caught her in the throat."

The above evidence does not authorize a finding that appellant acted "solely as the result of a sudden, violent and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person . . ." Code Ann. § 26-1102. On two occasions prior to trial, appellant admitted that his "passion" was not aroused. At trial, appellant admitted there had been no serious provocation. Accordingly, we find no error in the trial court's failure to charge in accordance with appellant's request. See *Jones v. State,* 246 Ga. 109 (269 SE2d 6) (1980).

5. Appellant, in his sixth and seventh enumerations of error, argues that the trial court erred in not giving definitional guidelines for the interpretation of the "(b) (7)" aggravating circumstance and

in failing to instruct the jury that they could not consider defendant's previous armed robbery conviction in determining his sentence.

In *Gilreath v. State,* 247 Ga. 814 (16) (279 SE2d 650) (1981), this court held: "While we do not read Godfrey [v. Georgia, 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980)] as holding that no death sentence imposed on the basis of this aggravating circumstance may stand absent clarifying instructions by the trial court, we find it unnecessary to decide that question here because there was no request for clarifying instructions. Moreover, all of the terms of Code Ann. § 27-2534.1 (b) (7) are words of ordinary significance which require no explication . . ." See Westbrook v. Zant, 518 FSupp. 1262 (2) (5th Cir. 1981); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980).

Contrary to appellant's assertions, the jury could not have erroneously understood that a death penalty could be returned on a non-statutory aggravating circumstance — i.e., the prior armed robbery conviction. The trial court's instructions clearly informed the jury that they must find a statutory aggravating circumstance, as defined by the court, before being allowed to go further and determine sentence. *Hardy v. State,* 245 Ga. 272 (264 SE2d 209) (1980).

6. Appellant contends the trial court's charge on voluntary intoxication is burden-shifting on the issue of intent and therefore violative of Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979).

The trial court charged: "Voluntary intoxication by use of alcohol, drugs or narcotics is no excuse for crime. The fact that one accused of a crime was under the influence of alcohol, drugs or narcotics at the time of the alleged crime may be shown as illustration of his motive in the transaction, but one voluntarily under the influence of alcohol, drugs or narcotics is presumed to intend the legitimate consequences of his acts, and the question is whether he intended to do the act or whether he intended the consequences of his act. If a person under the influence of alcohol, drugs or narcotics is sufficiently intelligent to know, understand and intend to do a certain act and to understand that certain consequences are likely to result from it, and does the act, he is then criminally liable for the consequences of the act."

We do not view the above charge as defective under Sandstrom. See *Blankenship v. State,* supra at 592-593. It informed the jury that voluntary intoxication is not an excuse for a criminal act and that if a person under the influence of drugs or alcohol is able to intend his act and understand that certain consequences are likely to result from it, he is criminally responsible for those consequences. The jury, of course, was instructed that the state bore the burden of establishing

all elements of the offense beyond a reasonable doubt. See *Moses v. State,* 245 Ga. 180 (263 SE2d 916) (1980).

## Sentence Review

7. Code Ann. § 27-2537 (c) provides that "[w]ith regard to the sentence, [this] court shall determine: (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) Whether . . . the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27.2534.1 (b), and (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant."

The evidence adduced at trial authorized the jury to find the following:

Appellant escaped from a penal institution in North Carolina where he had been serving a term for armed robbery. He made his way to Atlanta, and using the name Nick Michael Cordoba, obtained a job at Guthrie's Carnivals. At the time the homicide took place, the carnival was located at a Zayre department store.

The victim, Teresa Lavin, a 22-year-old student at Georgia State University, lived in the Chesterfield Apartments with Ms. Bartlett Carpenter, her son Brad, and Mr. Mark Butcher.

A few days prior to her death, Ms. Lavin was babysitting for the young child while Ms. Carpenter and Mr. Butcher were out of town. She took the young boy and his school mate, who lived in the apartment above, to the carnival. According to appellant's statement, the victim came up to him at the carnival where he was selling tickets for a ride. She approached appellant and asked him if he had any marijuana. He replied that he did not, but that he may be able to locate some at a later time. She then wrote her name and phone number on a ticket and gave it to him. Appellant called the victim that night. She told him that there were a lot of people at her apartment and that he should come over at 11:00 the next morning. When he arrived the next day, she answered the door in a nightgown, told him that she forgot he was coming over and to telephone her later because somebody was there.

On the day of the homicide, appellant and one Daniel Cody went over to the victim's apartment complex in a car which appellant had borrowed from a girl friend. They checked in with the security guard, who took appellant's name and license tag number. Unable to find the victim's apartment, appellant and Cody left, signing out with the security guard as they exited. Appellant then went and got something to eat, took two quaalude tablets and a "hit" of LSD. He then went back alone to the victim's apartment. This time the security guard

allowed him to go through but did not sign him in or out.

When appellant got to the victim's apartment, she was vacuuming. She let him in and they smoked some marijuana. He helped her clean the apartment for a while and then he lit another "joint." While he was smoking it he made some type of advance towards her or touched her on the shoulder. She turned and stared at him. He then slapped her so hard it spun her around. In self-defense, she swung the vacuum cleaner tube at him. He then took out a "hawk bill" knife and proceeded to literally rip the victim apart. He also beat the victim with the telephone receiver when, at one point, she attempted to call for help. After he had finished, he washed the blood off in the bathroom of the apartment and put on a vest he found. Leaving his bloodstained shirt in the apartment, appellant fled. He drove the automobile back to the carnival, left his bloodstained pants and knife in the carnival truck and drove to Birmingham. In Birmingham he sold the car he had "borrowed" from his girl friend for $95, and bought a bus ticket to New Orleans, where he stayed in a cheap hotel for two days before being arrested.

From the evidence adduced at trial, any rational trier of fact could have found beyond a reasonable doubt that appellant was guilty of the offense of murder. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Because the sentence of death in this case rests upon the aggravating circumstance set forth in Code Ann. § 27-2534.1 (b) (7), it must be reviewed in light of the U. S. Supreme Court's decision in Godfrey v. Georgia, supra, as construed by this court in *Hance v. State,* supra.

The "(b) (7)" aggravating circumstance ". . . consists of two major components, the second of which has three sub-parts, as follows: (I) The offense of murder was outrageously or wantonly vile, horrible or inhuman (II) in that it involved (A) aggravated batter[y] to the victim, (B) torture to the victim, or (C) depravity of mind of the defendant. In determining '(w)hether . . . the evidence supports the jury's or Judge's finding of (this) statutory aggravating circumstance . . .' (Code Ann. § 27-2537 (c) (2)), the evidence must be sufficient to satisfy the first major component of the statutory aggravating circumstance and at least one sub-part of the second component . . ." *Hance v. State,* supra at 860-861.

"The phrases 'outrageously or wantonly vile, horrible or inhuman' are words of common understanding, have essentially the same meaning, and are included in the statute to distinguish . . . murders for which the penalty of death is not appropriate, from those murders for which the death penalty may be imposed. Godfrey v. Georgia, supra. . . . Torture occurs when the victim is subjected to

serious physical abuse before death . . . [(] The death of a victim who dies instantaneously with little or no forewarning does not involve torture. [)] . . . [T]he fact that the victim was tortured or was the victim of an aggravated battery will also support a finding of depravity of mind of the defendant; i.e., a defendant who tortures the victim or subjects the victim to an aggravated battery before killing the victim can be found to have a depraved mind." Id. at 861-862. See *Gilreath v. State,* supra.

The victim in this case was not killed instantly, but was cut 12 times with a knife and subjected to a serious, vicious beating. By appellant's own admission, the victim was still alive when he left the apartment. The evidence established that the young victim suffered three very deep lacerations on the right side of the face, one above the forehead, one on the right cheek, and one extending from the left side of the nose across the upper lip and across the lower lip, two deep lacerations beneath the jaw on the left side, and a large laceration that extended from the right side of the neck to the back of the neck. This wound cut through all the muscles of the neck and blood vessels. The force of the knife displaced a bone in the neck so that it dislocated the spine. Further, there was a laceration extending from the top of the left breast across the breast and abdomen, extending down to the pants line. The back of the right hand of the victim had three small cuts and there were abrasions around the chin, upper lip area, neck and right collarbone area. The victim had bruises on the right side of the face, over both shoulders and over both arms. The injuries to the face were so forceful that the lip was broken and the bone above the front teeth was fractured. Forensic evidence established that these abrasions were caused when she was beaten with the receiver of a telephone. Only two and one half to three inches of tissue were left intact on the victim's neck and that was all that kept the victim from being completely decapitated. The injuries indicated that the victim had to be braced against the floor or wall so that the force of the major cutting wound to the neck could be applied. The victim died either from bleeding to death, shock, or aspirated blood. Appellant fled the scene and attempted to hide his crime. See Godfrey v. Georgia, supra.

The victim was a 22-year-old female, 5 feet, 4 1/2 inches in height, and weighing 120 pounds. Appellant is 6 feet tall and strong enough that the force of the blow of the telephone receiver against the victim resulted in the mouthpiece being broken off and landing half way across the room. The victim posed no threat to appellant.

The jury's finding of the "(b) (7)" aggravating circumstance is supported by the evidence. Jackson v. Virginia, supra. "Under the evidence of this case, [appellant's conduct] was of such a nature as to go to the very core of Code Ann. § 27-2534.1 (b) (7)." *Hance v. State,*

supra at 867. We find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factor.

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed. Cases selected for comparison included those cases involving death sentences or those involving life sentences for homicides in which the victim suffered severe physical abuse prior to death. Although, as appellant argues, lesser sentences than death are sometimes imposed in such cases, rarely is the death penalty not imposed. Gregg v. Georgia, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); Coley v. State, 231 Ga. 829 (204 SE2d 612) (1974). Moreover, it is readily apparent from the comparison of cases which are listed in the appendix attached hereto that murderers who have severely tortured their victims are not a "capriciously selected group of offenders." Gregg v. Georgia, supra. The cases listed in the appendix support the affirmance of the death penalty in this case — appellant's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering the crime and the defendant.

8. We have reviewed the trial court's charge to the jury and found that it is not subject to the defects dealt with in Hawes v. State, 240 Ga. 327 (240 SE2d 833) (1977), or Fleming v. State, 240 Ga. 142 (240 SE2d 37) (1977).

9. In his final enumeration of error, the appellant attacks the constitutionality of the Georgia death penalty statute on the grounds of prosecutorial discretion. The same argument has been raised before and decided contrary to appellant's position. He advances no new argument in support of his assertion. Gregg v. Georgia, supra; Moore v. State, 240 Ga. 807 (243 SE2d 1) (1978) and cits; see Knight v. State, 243 Ga. 770 (257 SE2d 182) (1979).

Judgment affirmed. All the Justices concur, except Weltner, J., not participating.

DECIDED FEBRUARY 23, 1982.

Stroud P. Stacy, for appellant.

Lewis R. Slaton, District Attorney, H. Allen Moye, Assistant District Attorney, Arthur K. Bolton, Attorney General, William B. Hill, Jr., Assistant Attorney General, for appellee.

APPENDIX.

McCorquodale v. State, 233 Ga. 369 (211 SE2d 577) (1974); Owens v. State, 233 Ga. 869 (214 SE2d 173) (1975); Birt v. State, 236

Ga. 815 (225 SE2d 248) (1976); *Coleman v. State,* 237 Ga. 84 (226 SE2d 911) (1976); *Street v. State,* 237 Ga. 307 (227 SE2d 750) (1976); *Hill v. State,* 237 Ga. 794 (229 SE2d 737) (1976); *Dix v. State,* 238 Ga. 209 (232 SE2d 47) (1977); *Bowden v. State,* 239 Ga. 821 (238 SE2d 905) (1977); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Stanley v. State,* 240 Ga. 341 (241 SE2d 173) (1977); *Campbell v. State,* 240 Ga. 352 (240 SE2d 828) (1977); *Lamb v. State,* 241 Ga. 10 (243 SE2d 59) (1978); *Griggs v. State,* 241 Ga. 317 (245 SE2d 269) (1978); *Westbrook v. State,* 242 Ga. 151 (249 SE2d 524) (1978); *Spraggins v. State,* 243 Ga. 73 (252 SE2d 620) (1979); *Bowen v. State,* 244 Ga. 495 (260 SE2d 855) (1979); *Hardy v. State,* 245 Ga. 272 (264 SE2d 209) (1980); *Hance v. State,* 245 Ga. 856 (268 SE2d 339) (1980); *Nelson v. State,* 247 Ga. 172 (274 SE2d 317) (1981); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981); *Messer v. State,* 247 Ga. 316 (276 SE2d 15) (1981); *Cervi v. State,* 248 Ga. 325 (282 SE2d 629) (1981).