S99P0356. JOHNSON v. THE STATE.
(519 SE2d 221)

HUNSTEIN, Justice.

A jury convicted Marcus Ray Johnson of malice murder, felony murder, aggravated assault, rape and aggravated battery. The jury recommended a death sentence for the murder, finding the following statutory aggravating circumstances: the murder was committed while Johnson was engaged in the commission of a rape; the murder was committed while Johnson was engaged in the commission of an aggravated battery; and the murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture, depravity of mind, and an aggravated battery to the victim before death. OCGA § 17-10-30 (b) (2), (7). The trial court sentenced Johnson to death. He appeals and we affirm.[1]

1. The evidence adduced at trial shows that the victim, Angela Sizemore, met Johnson in a west Albany bar called Fundamentals between 12:30 and 1:30 a.m. on March 24, 1994. Ms. Sizemore had been to a memorial service for an acquaintance the previous day, and she had been drinking so heavily the bar had stopped serving her. Johnson was wearing a black leather jacket, jeans, black biker boots, and a distinctive turquoise ring. According to a witness, Johnson was angry and frustrated because another woman had spurned his advances earlier in the evening. The bar owner and its security officer (who both personally knew Johnson) testified that they saw Johnson and Ms. Sizemore kissing and behaving amorously. Johnson

---

[1] The crimes were committed on March 24, 1994. Johnson was indicted in Dougherty County in 1994 and re-indicted on November 26, 1997, for malice murder, felony murder, aggravated assault, rape, aggravated battery, and armed robbery. On December 5, 1997, the State re-filed its notice of intent to seek the death penalty. The State nolle prossed the armed robbery charge and, on April 5, 1998, the jury convicted Johnson of the remaining counts. The jury recommended a death sentence on April 7, 1998. In addition to the death sentence for malice murder, the trial court sentenced Johnson to life imprisonment for the rape and to 20 years for aggravated battery. The trial court merged the aggravated assault conviction and the felony murder conviction was vacated by operation of law. *Malcolm v. State,* 263 Ga. 369 (4) (434 SE2d 479) (1993). Johnson's motion for new trial was filed May 4, 1998, amended September 30, 1998, and denied by the trial court on October 12, 1998. This case was docketed in this Court on December 2, 1998, and orally argued on March 15, 1999.

and Ms. Sizemore left Fundamentals together; the bartender handed Ms. Sizemore's car keys directly to Johnson. They were seen walking towards Sixteenth Avenue.

At approximately 8:00 a.m. on March 24, 1994, a man walking his dog found Ms. Sizemore's white Suburban parked behind an apartment complex in east Albany, on the other side of town from Fundamentals. Ms. Sizemore's body was lying across the front passenger seat. She had been cut and stabbed 41 times with a small, dull knife, and she had bruises and marks from being hit and dragged. The fatal wounds were six stab wounds to the heart. The medical examiner also discovered that a foreign object had been inserted into the victim's vagina and anus; the object had ruptured the wall of the vagina and lacerated the rectum. He testified that she was alive during the stabbing and genital mutilation.

Four people testified that they saw Johnson about an hour before the body was found. Two witnesses testified that they saw him walk from the area where the victim's Suburban was parked through an apartment complex to a bus stop. He boarded a bus and asked if the bus would take him to the Monkey Palace (a bar where Johnson worked) in west Albany. Three witnesses, including the bus driver, identified Johnson as being on the bus (one of the witnesses who saw Johnson walk through the apartment complex boarded the same bus as he did). Two witnesses stated that their attention was drawn to Johnson because that area of Albany is predominantly African-American, and it was extremely unusual to see a Caucasian there at that time of day. All the witnesses testified that Johnson's clothes were soiled with dirt or a substance they had assumed to be red clay. The witnesses gave similar descriptions of his clothing; in court, two witnesses who sat near Johnson on the bus identified his jacket, boots and distinctive turquoise ring.

The police determined that Ms. Sizemore was murdered in a vacant lot near Sixteenth Avenue in west Albany. Present in the lot were bloodstains, scuff marks, drag marks, and a pecan branch with blood and tissue on one end. The medical examiner testified that this branch was consistent with the object used to mutilate the victim's vagina. The vacant lot is about two blocks from Fundamentals and about half a block from the house where Johnson lived with his mother.

A friend of Johnson testified that after he called her early on March 24, she picked him up at his house at 9:30 a.m. and took him to her home, where he slept on her couch for several hours. Johnson then told her he wanted to take a bus to Tennessee and that he needed her to go to the Monkey Palace to pick up some money he was owed. At his request, she dropped him off near a church while she went to get the money. The police were waiting for Johnson to show

up, and they returned with the friend and arrested Johnson. Before they told him why they were arresting him, he blurted, "I'm Marcus Ray Johnson. I'm the person you're looking for."

DNA testing revealed the presence of the victim's blood on Johnson's leather jacket. Johnson had a pocketknife that was consistent with the knife wounds on the victim's body. He had scratches on his hands, arms, and neck. In a statement, Johnson said he and the victim had sex in the vacant lot and he "kind of lost it." According to Johnson, the victim became angry because he did not want to "snuggle" after sex and he punched her in the face. He stated he "hit her hard" and then walked away, and he does not remember anything else until he woke up after daybreak in his front yard. He said, "I didn't kill her intentionally if I did kill her."

In the sentencing phase, the State presented evidence that Johnson assaulted a 76-year-old jailer during an escape attempt by striking the jailer a glancing blow in the head with a gun butt. The blow "peeled back" part of the jailer's scalp; the wound required 21 staples to close. The medical doctor who treated the jailer opined that based on the amount of force required to inflict the wound, had the blow directly hit the jailer, it would have crushed his skull and he probably would not have survived.

The evidence adduced was sufficient to enable a rational trier of fact to find Johnson guilty of malice murder, felony murder, aggravated assault, rape and aggravated battery beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The evidence was also sufficient to authorize the jury to find the statutory aggravating circumstances which supported his death sentence for the murder. Id.; OCGA § 17-10-35 (c) (2).

2. A review of the record establishes that the State's notice of intent to seek the death penalty was not untimely. Unified Appeal Procedure Rule II (A). The trial court's denial of Johnson's motion to bar the death penalty due to lack of a speedy trial was also not error. See *Barker v. Wingo*, 407 U. S. 514 (92 SC 2182, 33 LE2d 101) (1972); *Brown v. State*, 264 Ga. 803 (2) (450 SE2d 821) (1994) (*Barker* requires consideration of four factors: the length of the delay; the reason for the delay; the defendant's assertion of his right; and the prejudice to the defendant). Applying the four *Barker* factors, the record reveals that although four years elapsed between arrest and trial, the defense was clearly responsible for some of the delay. In this regard, the record reveals that Johnson repeatedly moved for continuances on the eve of trial, including at the same hearing where he sought to bar the death penalty due to lack of a speedy trial. As to the third factor, Johnson filed no demand for speedy trial pursuant to OCGA § 17-7-171 (c) and did not otherwise invoke his speedy trial right until March 11, 1998, two weeks before trial. See *Brown*, supra

at 805 (lengthy delay in filing speedy trial demand weighs against the defendant). Finally, as to the fourth factor, we find little merit to Johnson's claims he was prejudiced by the delay because the elderly jailer he assaulted would not have died before his trial.[2] While the State was able to present evidence suggesting that the injury inflicted by Johnson was a contributory factor in the jailer's death, the absence of testimony by the jailer detailing Johnson's attack and the adverse consequences he had sustained because of the attack worked to Johnson's advantage. Id. at 805 (2).

3. Johnson argues that the trial court erred by ordering a psychiatric evaluation over his objection. However, this argument is moot because Johnson never submitted to a court-ordered psychiatric evaluation and no psychiatric evidence was presented at trial. Johnson's claim that his counsel was prevented from advising him during the court-ordered psychiatric evaluation is also moot for the same reason.

4. Johnson contends that the trial court erred in denying the motion to suppress his audiotaped statement, claiming that the tape was altered and the statement was not freely and voluntarily made. He argues that a "break" occurred in the recording which indicates that the police edited out a portion of his statement; the tape recording was 24 minutes long and the officers testified that they interviewed Johnson for 30 to 60 minutes. The officers did not recall turning off the tape recorder during the interview; Johnson's tape expert testified the tape was stopped and restarted one time during the interview.

To establish the foundation for an audiotaped statement's admissibility, the State must prove: 1) the mechanical device was capable of recording a statement; 2) the operator was competent; 3) the recording is authentic and correct; 4) no changes, additions, or deletions were made; 5) the manner of preservation; 6) the identity of the speakers; and 7) the statement was not elicited through duress. *Page v. State*, 249 Ga. 648 (2) (b) (292 SE2d 850) (1982); *Nobles v. State*, 233 Ga. App. 63 (3) (503 SE2d 321) (1998). The State adequately proved these elements, and the defense expert conceded that the tape was not altered or recorded over. See id. In addition, an audiotaped statement is not rendered inadmissible simply because the police stopped and restarted the recorder during the interview, and Johnson was able to explore the possible reasons for the "break" during cross-examination. See *Peacock v. State*, 170 Ga. App. 309 (4) (316 SE2d 864) (1984). There was no evidence of selective recording. See

---

[2] Johnson assaulted the jailer after he had been incarcerated only about six months, and the guard died approximately fifteen months after Johnson's arrest.

id. The trial court did not err by ruling that the State had established a proper foundation for the admission of the audiotaped statement. *Page*, supra.

The trial court also did not err by ruling that Johnson's statement was voluntary. "In determining whether a defendant has made a voluntary statement, courts must look at the totality of the circumstances." (Footnote omitted.) *Fields v. State*, 266 Ga. 632, 633 (2) (469 SE2d 184) (1996). Johnson was 28 years old. The police read him his constitutional rights, and he signed a form acknowledging and waiving his rights. The interview lasted less than one hour and there were no promises or threats to induce his statement. He did not appear to be suffering from any condition that would impair his understanding of his rights waiver, and he never requested an attorney. See id.

5. Johnson wanted to question the district attorney and former district attorney regarding cases in which the district attorney did not seek the death penalty that Johnson alleges were more "heinous" than his case, but the trial court quashed the subpoenas. We find no error. "[D]istrict attorneys do not have unfettered discretion to seek the death penalty, and the decision to impose it rests with the jury and cannot be upheld absent a finding of an aggravating circumstance. [Cit.]" *McClain v. State*, 267 Ga. 378, 389 (12) (477 SE2d 814) (1996). "[P]olicy considerations . . . argue against requiring district attorneys to defend their decisions to seek the death penalty." (Footnote omitted.) *Perkins v. State*, 269 Ga. 791, 794 (2) (505 SE2d 16) (1998). We note that the trial court allowed Johnson to file a written proffer to support his argument that the district attorney had not sought the death penalty in more "heinous" cases, but he failed to do so.

6. Witnesses cannot be compelled to submit to interviews with the defense. *Rutledge v. State*, 245 Ga. 768 (2) (267 SE2d 199) (1980). Johnson has thus failed to establish any reversible error in regard to his enumeration numbers 36 and 51.

7. At Johnson's request, the trial court conducted an in camera review of the State's file, and the trial court found nothing exculpatory that was withheld. Johnson, as part of his motion for an in camera review, also requested that the State's file be copied and sealed but no sealed copy of the State's file appears in the record in response to this request. Johnson complains that the failure to seal a copy of the State's file amounts to reversible error. We disagree. Johnson

cannot now be heard to complain that the [State's file] was not in fact sealed in spite of the trial judge's apparent agreement to do so and the prosecution's lack of objection thereto. If this was not thereafter done, defense counsel should have

persevered and insisted that it be done. His failure to do so amount[s] to a waiver.

*Durham v. State*, 239 Ga. 697, 700 (3) (b) (238 SE2d 334) (1977). Further, Johnson has neither alleged nor otherwise established how he was harmed by the failure to seal the State's file. Accordingly, we find no merit in this enumeration.

8. The trial court did not err by refusing to grant Johnson's motion for continuance ten days before trial and his renewed motion three days before trial. OCGA § 17-8-22; *Martin v. State*, 268 Ga. 682 (2) (492 SE2d 225) (1997) (the granting or denial of a motion for continuance is a matter for the sound discretion of the trial court). The record reveals that none of the many reasons Johnson listed in support of his motions, including a local flood, alleged late discovery provided by the State, defense counsel's fatigue due to another recent death penalty trial, and alleged newly-discovered exculpatory evidence,[3] have merit sufficient to demonstrate an abuse of discretion by the trial court. See *O'Neal v. State*, 254 Ga. 1 (2) (325 SE2d 759) (1985).

9. Johnson challenges the trial court's excusal for hardship, or the failure to remove for hardship, of seven prospective jurors. After a review of the record, we find that the trial court did not abuse its discretion in granting or denying the removal of these prospective jurors for hardship reasons. OCGA § 15-12-1 (a); *McMichen v. State*, 265 Ga. 598 (33) (a) (458 SE2d 833) (1995); *Dorillas v. State*, 224 Ga. App. 336 (1) (b) (480 SE2d 351) (1997). Our review of the voir dire transcript reveals no merit to Johnson's claims that the trial court improperly restricted defense counsel's voir dire of the prospective jurors or that the trial court erred when it explained the bifurcated nature of the pending proceedings to the jurors during voir dire.

10. The trial court's voir dire questions regarding the death penalty were not improperly phrased so as to constitute reversible error. The transcript reveals that if a juror did not state he or she was conscientiously opposed to the death penalty, the trial court thereafter phrased its questions to determine what impact the jurors' beliefs "in favor of" the death penalty would have on each juror's ability to serve

---

[3] Johnson raised two arguments regarding alleged newly-discovered exculpatory evidence: (1) The record reveals that the defense was served with the GBI Crime Lab report in October 1995 regarding a "head hair of possible Negroid origin" found at the crime scene. Johnson alleged that a continuance was necessary so that the defense could explore obtaining DNA from that hair and possibly comparing its DNA against a national DNA index system. There was no showing of due diligence on the defense's part in regard to this evidence. OCGA § 17-8-20. (2) The 40 additional photos of the victim's body were seen by the defense's expert and used to support his opinion at trial. Johnson can thus demonstrate no harm regarding the trial court's ruling regarding this evidence.

on the jury. While it would be better to phrase the inquiries by avoiding the "in favor of" language and using instead, e.g., a juror's beliefs "in regard to" the death penalty, we find no merit in Johnson's argument that the phrasing used by the trial court served in any manner to alter or influence any potential juror's beliefs on capital punishment.

11. The procedure used for the pretrial identification of Johnson by the witnesses who saw him in east Albany near the body's location was not impermissibly suggestive, nor was there a substantial likelihood of misidentification. See *Neil v. Biggers*, 409 U. S. 188, 198-199 (III) (93 SC 375, 34 LE2d 401) (1972); *Whatley v. State*, 266 Ga. 568 (2) (468 SE2d 751) (1996). Only two witnesses were shown a photographic lineup and both picked Johnson as the man they saw. The police did not suggest an identification of Johnson with regard to either photo array, and Johnson's photo was not distinct from the others. The photo identifications were not improperly suggestive. See *Whatley*, supra.

In addition, viewing the totality of the circumstances, there was no substantial likelihood of misidentification with these four witnesses. The factors to be considered in determining whether an identification was reliable are: 1) the opportunity for the witness to view the defendant; 2) the degree of attention of the witness; 3) the accuracy of the prior description; 4) the witness's level of certainty; and 5) the length of time between the viewing and the identification. *Neil*, supra, 409 U. S. at 199-200; *Thomason v. State*, 268 Ga. 298 (3) (486 SE2d 861) (1997). The record shows that these witnesses viewed Johnson from close range in daylight for an extended period of time. All four witnesses provided the police with descriptions of Johnson on March 24, 1994, the same day they saw him. Two of the witnesses said their attention was drawn to Johnson because it was rare to see a Caucasian in that neighborhood at that time of the morning, and his appearance was even more unusual because of his biker-style clothing. The witnesses gave similar descriptions of his clothing; in court, the two witnesses who sat across from Johnson on the two buses he rode identified his leather jacket, biker boots and turquoise ring. They all remembered that he was soiled with dirt or red clay. Two witnesses identified Johnson within 24 hours of seeing him, one witness picking him from a photo array and one witness recognizing him from a television news report (after providing police with his description). The bus driver picked Johnson out of a photo lineup five months after seeing him. The fourth witness did not make an identification of him until a court hearing several years later. All the witnesses were certain about their identification. We conclude that there was no substantial likelihood of misidentification and the identification testimony was properly admitted. See *Neil*, supra, 409 U. S. at

200-201; *Thomason,* supra, 268 Ga. at 304.

12. Johnson claims that the trial court erred by refusing to allow the testimony of a defense expert on eyewitness identification. After a hearing where the expert testified, the trial court ruled that "in exercising my discretion, [I] grant the motion to exclude this testimony because in the Court's opinion, this information that would be provided by this witness is information that is within the knowledge of the jurors and is not a proper subject for expert testimony under these circumstances." After reviewing the proposed testimony, we conclude that the trial court did not abuse its discretion in making this ruling. See *Gardiner v. State,* 264 Ga. 329 (5) (444 SE2d 300) (1994).

13. Johnson complains that the State failed to establish a chain of custody regarding the blood sample taken from his leather jacket that was matched to the victim's blood. He asserts that the chain of custody was broken because the person at the State Crime Lab who removed the blood from his jacket did not testify. At trial, Keith Goff, the Crime Lab technician who tested the blood, testified that he did not personally remove the blood from Johnson's leather jacket or see it removed. The Lab employee who removed the blood from the jacket now lives in Wyoming. Goff testified that, in accordance with general Crime Lab procedure, he received the blood sample taken from the leather jacket on a piece of cotton thread stapled to a note card, which contained the case number, the item number, and the initials of the Lab technician who collected the sample. The technician who collected the sample personally gave the sample to Goff. Johnson does not allege any other breaks in the chain of custody.

We find that the trial court did not abuse its discretion by ruling that the chain of custody was adequately proved. "[W]hen blood samples are handled in a routine manner and nothing in the record raises a suspicion that the blood sought to be admitted is not the blood tested, the blood is admissible and 'the circumstances of each case need only establish reasonable assurance of the identity of the sample.' [Cit.]" *Stephens v. State,* 259 Ga. 820 (3) (388 SE2d 519) (1990). See also *Givens v. State,* 214 Ga. App. 774 (2) (449 SE2d 149) (1994) (lack of testimony by Crime Lab employee who originally received exhibits does not break the chain of custody). Absent affirmative evidence of tampering, "mere speculative doubt as to the handling of evidence while in the possession of the Georgia Crime Lab is a matter for consideration by the jury. [Cit.]" Id. at 775.

14. Based on our review of the transcript, we find no error in the trial court's rulings on hearsay objections, the admission of State's evidence during rebuttal in the guilt-innocence phase, or its rulings on mitigation evidence in the penalty phase. The trial court did not abuse its discretion regarding the State's cross-examination of

defense witnesses. See *Robinson v. State,* 258 Ga. 279 (3) (368 SE2d 513) (1988). Assuming that evidence of Johnson's marijuana usage was not relevant to explain his alleged loss of memory on the day of the crime, the admission of this evidence was harmless given the overwhelming evidence of Johnson's guilt. *Crosby v. State,* 269 Ga. 434 (3) (498 SE2d 62) (1998); *Anderson v. State,* 236 Ga. App. 679 (4) (513 SE2d 235) (1999).

15. Johnson argues that the State committed reversible error by making improper closing arguments in both phases of the trial.

(a) *Guilt-innocence phase.* Johnson complains that the prosecutor's "make them explain" argument impermissibly shifted the burden of proof and was a comment on the defendant's failure to testify. During closing argument, the prosecutor repeatedly asked the jury to make the defense explain various pieces of circumstantial evidence.[4] Before beginning his "make them explain" phase of the argument, the prosecutor reminded the jury that the defendant does not have to present any evidence and the State has the burden of proof. We conclude that this argument did not shift the burden of proof or constitute an improper comment on Johnson's failure to testify. See *Ward v. State,* 262 Ga. 293 (6) (a) (417 SE2d 130) (1992) ("make them explain" argument not improper); *United States v. Norton,* 867 F2d 1354, 1364 (11th Cir. 1989). The State's comments were not directed at the defendant's decision not to testify; instead, they were directed at defense counsel's failure to rebut or explain the State's evidence. Id.; *Ingram v. State,* 253 Ga. 622 (8) (323 SE2d 801) (1984) (while a prosecutor may not comment on a defendant's failure to testify, he may argue that evidence of guilt has not been contradicted or rebutted).

Although Johnson also challenges the State's repeated references to Johnson as a killer rapist, we conclude the State's comments constituted reasonable inferences drawn from the evidence. Compare *Bell v. State,* 263 Ga. 776 (439 SE2d 480) (1994). Our review of the State's guilt-innocence phase closing argument reveals that the prosecution did not exceed the bounds of permissible argument.

(b) *Sentencing phase.* We find no error with the State's sentencing phase closing argument. The State's "billboard" illustration used with its "send a message" argument was permissible, *McClain v. State,* 267 Ga. 378 (4) (a) (477 SE2d 814) (1996), and we find no error

---

[4] For example, the prosecutor argued, "Make the defense explain to you in your own mind that if Marcus Ray did not kill Angela Sizemore, then why is it four persons, four people who don't know each other, all were able to identify him as the person who left the scene at Swift where Angela Sizemore's body was found" and "Make them explain why Marcus Ray Johnson had a blackout and memory loss on this day — on this day when there's no evidence that he's ever had a blackout or memory loss before."

in the State's deterrence argument. *Fleming v. State*, 265 Ga. 541 (458 SE2d 638) (1995). Contrary to Johnson's contention, the prosecutor did not incorporate the principles from *Eberhart v. State*, 47 Ga. 598, 609 (1873) into his argument. Compare *Hawes v. State*, 240 Ga. 327 (11) (240 SE2d 833) (1977). It is not improper for the State to vigorously urge that mercy is not appropriate in the case at hand. *Hicks v. State*, 256 Ga. 715 (23) (352 SE2d 762) (1987). When viewed in context, the State's argument "Do not be swayed by pleas for mercy and sympathy and let mercy and sympathy come from a higher Court" clearly reflects that the "higher Court" referred to by the State is a higher spiritual power and not an appellate court. Therefore, this argument did not violate *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985). The State's argument that "no witnesses lied" was in response to defense counsel's claim during guilt-innocence phase closing argument and sentencing phase opening statement that State witnesses had lied, and the comment did not constitute the prosecutor's personal opinion regarding the veracity of the witnesses. See *Shirley v. State*, 245 Ga. 616, 617 (1) (266 SE2d 218) (1980) (while improper for counsel to state personal belief as to veracity of a witness, not improper for counsel to urge jury to deduce such a conclusion from the evidence). The issue of a defendant's future dangerousness is relevant in the sentencing phase and the prosecution's reference thereto in this case was proper given evidence of Johnson's attack on a jailer. *Pye v. State*, 269 Ga. 779 (19) (505 SE2d 4) (1998). No error resulted from the State's argument regarding parole. OCGA § 17-10-31.1 (d); *Jenkins v. State*, 265 Ga. 539 (1) (458 SE2d 477) (1995). Our review of the sentencing phase closing argument as a whole reveals no grounds for reversal.[5]

16. In the guilt-innocence phase, the trial court charged the jury:

It is my duty and responsibility to ascertain the law applicable to this case and to instruct you on that law by which you are bound. It is your responsibility to ascertain the facts of the case from all of the evidence presented. It then becomes your duty and responsibility to apply the law I give you in [the] charge to the facts as you find them to be.

This charge is taken directly from the pattern jury instructions and is a correct statement of the law. Suggested Pattern Jury Instruc-

---

[5] Contrary to Johnson's general contentions, the prosecution's factual arguments were based on inferences reasonably drawn from the evidence; the argument explaining why the jurors should follow Georgia law rather than divine law, while inappropriate and should not be repeated, was not reversible error; the argument as a whole did not improperly denigrate Johnson's constitutional rights and did not inflame the passions or prejudices of the jury.

tions, Vol. II: Criminal Cases (2nd ed. 1991), p. 9; *Parker v. State*, 270 Ga. 256 (3) (507 SE2d 744) (1998). We also find no error in the trial court's guilt-innocence phase charge on permissible inferences of intent. See *Pope v. State*, 256 Ga. 195 (16) (345 SE2d 831) (1986); *Beal v. State*, 255 Ga. 446 (3) (339 SE2d 581) (1986). Our review of the guilt-innocence phase jury charge as a whole reveals no impropriety.

17. The trial court did not err by refusing to give several of Johnson's requests to charge in the sentencing phase. As to the defense's requested charge on residual doubt, it is well-settled that the trial court is not required to identify specific mitigating circumstances in the charge. *Jenkins v. State*, 269 Ga. 282 (25) (498 SE2d 502) (1998). Also, although the trial court did not specifically charge the jury that there was a presumption in favor of a life sentence, the court did charge the jury that it could only return a death sentence if it found the existence of one or more statutory aggravating circumstances beyond a reasonable doubt. Id. at 296 (26). Therefore, the sentencing phase jury charge was sufficient and without error.

18. Johnson has failed to establish any error resulting from the State's filing of its proposed jury charges six days rather than ten days before trial.

19. Johnson's contention that the testimony of the State's victim-impact witnesses exceeded the scope of the proposed victim-impact statements provided to the defense before trial is without merit. The record shows that the victim-impact witnesses did not stray from their prepared statements, and the victim-impact testimony was not improper. See *Turner v. State*, 268 Ga. 213 (2) (486 SE2d 839) (1997); *Simpkins v. State*, 268 Ga. 219 (3) (486 SE2d 833) (1997); *Livingston v. State*, 264 Ga. 402 (1) (d) (444 SE2d 748) (1994).

20. Based on our careful review of the entire transcript, we find no merit in Johnson's contention that his conviction and sentence were rendered fundamentally unfair by alleged prosecutorial misconduct.

21. The death sentence in this case was not imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentence is also not disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). The cases listed in the Appendix support the imposition of the death penalty in this case as they involve a murder during the commission of a rape, OCGA § 17-10-30 (b) (2), or the aggravating circumstance involving an aggravated battery, depravity of mind, or torture. Id. at (b) (7).

22. Johnson's enumeration of error no. 44 must be deemed abandoned. See generally *McGhee v. State*, 264 Ga. 193 (3) (442 SE2d 757) (1994). Johnson's remaining enumerations of error are either

addressed in previous enumerations or are without merit.

*Judgment affirmed. All Justices concur, except Benham, C. J., and Sears, J., who concur in judgment only as to Division 5 and Fletcher, P. J. , who concurs in part and dissents in part.*

APPENDIX.

*Pruitt v. State,* 270 Ga. 745 (514 SE2d 639) (1999); *Pye v. State,* 269 Ga. 779 (505 SE2d 4) (1998); *Wellons v. State,* 266 Ga. 77 (463 SE2d 868) (1995); *Williams v. State,* 258 Ga. 281 (368 SE2d 742) (1988); *Blankenship v. State,* 258 Ga. 43 (365 SE2d 265) (1988); *Lipham v. State,* 257 Ga. 808 (364 SE2d 840) (1988); *Ford v. State,* 255 Ga. 81 (335 SE2d 567) (1985); *Ross v. State,* 254 Ga. 22 (326 SE2d 194) (1985); *Allen v. State,* 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State,* 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State,* 250 Ga. 66 (295 SE2d 727) (1982); *Krier v. State,* 249 Ga. 80 (287 SE2d 531) (1982); *Justus v. State,* 247 Ga. 276 (276 SE2d 242) (1981):

FLETCHER, Presiding Justice, concurring in part and dissenting in part.

I dissent to the affirmance of the death sentence because the state's closing argument in the sentencing phase was highly inflammatory, appealed to the passion, prejudices and generalized fears of the jurors, was not tailored to the defendant's personal responsibility, relied upon the prosecutor's personal opinions, and misstated the law.

However, I concur in the affirmance of Johnson's conviction, but in judgment only as to division 12.

DECIDED JULY 6, 1999 —
RECONSIDERATION DENIED JULY 30, 1999.

*Ronnie J. Lane, Tony C. Jones,* for appellant.

*Kenneth B. Hodges, District Attorney, Bradford R. Pierce, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Patricia A. Burton, Assistant Attorney General,* for appellee.