S00A0227. SLAKMAN v. THE STATE.
(533 SE2d 383)

FLETCHER, Presiding Justice.

Barry Steven Slakman was convicted of the malice murder, felony murder and aggravated assault of his wife, Shana Glass Slakman. The trial court merged the convictions for felony murder and aggravated assault into the malice murder conviction and sentenced Slakman to life imprisonment. Slakman was also convicted of an aggravated assault on police officer Danny Hendrix who was conducting the murder investigation. Slakman was sentenced to 20 years for this offense to run concurrently with the murder conviction.[1]

Considering the totality of circumstances in this case, the trial court erred in allowing the court reporter to testify that she heard Slakman make an admission of guilt to the murder of his wife as he exited the courtroom, and that what she heard Slakman say was "verified" by her official audiotape. Therefore, we reverse and

---

[1] Both crimes were committed on July 6, 1993. Slakman was indicted by the grand jury on January 21, 1994. His trial took place April 4 through April 26, 1994. The jury returned the verdict on May 4, 1994. Slakman filed a motion for new trial on May 19, 1994. It was denied on April 20, 1999. A notice of appeal was filed on May 17, 1999, and the case was submitted to this Court for consideration on briefs on December 20, 1999.

remand this case for a new trial on the murder charges.

### FACTS.

In early July 1993 Shana Slakman informed Barry Slakman that she was seeking a divorce from him. On July 6, 1993 at approximately 8:30 a.m. Penny Adamo, Shana's mother, arrived at the Slakman apartment to help Shana move out. Ms. Adamo had discussed the move with Shana the previous evening. When Shana did not come to the door, Ms. Adamo became alarmed and summoned the police. A police officer found Shana dead in the bathtub with the water still running. An autopsy revealed that Shana died between the hours of 6:00 a.m. and 8:00 a.m. from severe head trauma complicated by manual strangulation.

There were no signs of forced entry to the apartment, nor were there any indications of theft. The front door was dead bolted when police arrived.

A neighbor told police that at approximately 7:20 that morning she had seen Barry Slakman put two full garbage bags in the trunk of his car and drive away. She testified at trial that Slakman was acting "fidgety" and looking from side to side.

Later that morning Slakman went to see a divorce lawyer. The lawyer's receptionist testified that Slakman was nervous and had a "petrified" look on his face. That same morning Slakman went to Merrill Lynch to ascertain whether his account was solely in his name or was held jointly with his wife. There was testimony that he broke into tears while there.

Slakman gave a statement to police later that day during which he was visibly shaking. Suspicious because of Slakman's nervous behavior, police officer Danny Hendrix deliberately misinformed Slakman that Shana's body had been found in an upstairs bedroom. When Slakman continued to behave nervously, Hendrix gave him *Miranda* warnings and Slakman signed a waiver of rights.

Slakman thereafter stated that he left for work shortly before 6:00 a.m., then returned home at approximately 7:15 a.m. After Slakman stated that he heard the shower running at that time, he exclaimed to Hendrix, "Oh my God, you said you found her in the shower." When Hendrix denied this, Slakman argued with him over what he had been told.

In his statement Slakman maintained he had taken out the garbage and placed it in a dumpster. Police officers went through all the garbage at the apartment complex and, by matching addresses on discarded mail, were able to correlate bags of garbage to every apartment except the Slakman residence.

During the interview Lieutenant Hendrix interrupted Slakman's

statement and asked whether Slakman had killed his wife. Slakman lunged at Hendrix and began strangling him. Slakman then plunged a pen into Hendrix's hand with such force that the tip imbedded and had to be surgically removed.

1. After reviewing the evidence in the light most favorable to the jury's determination of guilt, we conclude that a rational trier of fact could have found Slakman guilty of the crimes charged beyond a reasonable doubt.[2]

## THE COURT REPORTER'S TESTIMONY.

2. During its cross-examination of Slakman, the state showed him a photograph of Shana in a body bag, taken at the scene of the crime.[3] Slakman became emotional and the trial court ordered the jury to the jury room. The court additionally ordered that Slakman be escorted from the courtroom by a deputy. As he left the courtroom, Slakman made a statement which was not transcribed by the court reporter.[4] However, the court reporter's tape recorder was still operating.

Out of the presence of the jury the court ordered the court reporter to "perfect" the record[5] by stating her recollection of what Slakman said. The court reporter stated that Slakman said, "How could I – why did I do that to her." The court then twice stated for the record that it had heard Slakman make the same statement. Neither defense counsel nor the district attorney indicated that they had heard what Slakman said, and it appears from the record that, but for the trial court's intervention, Slakman's statement would have gone unnoticed by either of them.

The trial court thereafter allowed defense counsel to put on the record the testimony of the deputy who escorted Slakman from the courtroom. Out of the presence of the jury this deputy testified that he heard Slakman say, "why did they do that to her."

When cross-examination of Slakman resumed, he denied making an admission that he had "done that" to Shana, but instead testified he had asked why "they" had done it.

Over the defense's objection the court reporter was permitted to testify before the jury to what she heard Slakman say.[6] The court

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] See Division 6 for Slakman's contentions regarding the state's prosecutorial misconduct in showing him this photograph.

[4] Contrary to the state's position on appeal, the record clearly indicates that the jury had exited the courtroom before Slakman made his statement.

[5] The court indicated that it was taking this action because the court reporter had not transcribed the statement in question.

[6] The state contends that Slakman did not preserve this enumerated error for appellate

reporter additionally testified that listening to the audiotape she had recorded of Slakman's statement "verified" what she thought she had heard.[7] After the court reporter testified to Slakman's inculpatory statement and its verification by the official tape recording, the state was permitted to play the audiotape for the jury. During closing arguments the state repeatedly referenced Slakman's statement as it had been testified to by the court reporter, and once again played the court reporter's audiotape for the jury.

The trial court did not give the jury any instructions regarding the manner in which it was to consider the audiotape.

Slakman argues that because there was an audiotape of his statement from which the jury could make its own determination of what had been said, the court reporter should not have been permitted to testify to what she heard or to testify that the audiotape "verified" her testimony.[8] We agree. Further, we conclude that this error was not harmless, but requires a new trial.

The issue before us is the propriety of the court reporter's testimony to what she heard Slakman say as he exited the courtroom, and her bolstering of her own testimony by testifying that what she heard was verified by her audiotape. The court reporter's testimony went to the ultimate issue to be decided – whether Slakman murdered his wife. Prior to hearing the audiotape of Slakman's statement, the jury heard not only the court reporter's testimony of what she heard Slakman say, but her testimony that the official audiotape of the trial confirmed what she had heard.

We cannot overlook the jury's perspective of the dual role that the court reporter played in this case. In the eyes of the jury the court reporter was not only an employee of the court, but was the official transcriber of witness testimony. Given the official capacity in which the court reporter served at trial, the impact of her testimony on the jury's verdict cannot be ignored. These facts distinguish this case from the authorities cited by the dissent for the proposition that an ear witness to a statement captured on tape may testify to that statement.

Further, this Court has held that where a tape recording of the defendant's conversation or statement is played to the jury, it is not

<hr>

review. However, the record shows that the state and defense entered into a post-trial stipulation that defense counsel timely objected to the court reporter's testimony regarding what she heard Slakman say. We are unpersuaded by the state's attempts to now disavow the effect of this stipulation.

[7] Trial counsel was permitted to offer the testimony of the deputy, in surrebuttal, as to what he heard Slakman say. Appellate counsel argues that admission of this evidence was error, but that trial counsel's strategy was necessitated by the court's actions in this case.

[8] Slakman's complaints on appeal are directed to the admission of the court reporter's testimony rather than to the admission of the audiotape.

error to allow the jury to also view a transcript of that tape recording if particularized safeguards are met. The most critical of these safeguards includes an instruction to the jury that it is the tape recording and not the transcript which constitutes evidence of the defendant's statement; that the jury must determine for itself what was said on the tape recording;[9] that if the jurors cannot understand the content of the tapes, they are to ignore the corresponding transcripted portion of the recording;[10] and that any discrepancies between the tape recording and transcript are to be resolved in favor of the audiotape.[11]

The court reporter in this case was the person officially charged with listening to and transcribing the testimony of witnesses. Her testimony, at a minimum, had the effect of a transcript of Slakman's statement because it reflected the words she would have transcribed had she been taking them down. It is likely that the jury gave great deference to her testimony regarding this statement because of her official role in the trial. Yet none of the safeguards that would have been required of a transcript of Slakman's statement prepared by this court reporter were required of her testimony. At no time did the court instruct the jury that it was to determine for itself what was recorded on the audiotape or the manner in which it was to resolve any discrepancies between the court reporter's testimony and the contents of the audiotape. To the contrary the jury was guided only by the court's instruction that the testimony of witnesses was evidence in the case. The court's error in this regard was exacerbated by the fact that the court reporter was permitted to testify before the audiotape was played, thus predisposing the jury to an interpretation of the audiotape.

Considering the totality of circumstances, the admission of the court reporter's testimony in conjunction with the trial court's failure to give any limiting instructions to the jury constituted harmful error, necessitating a new trial. Therefore, we need not determine whether Slakman was denied any rights under the Georgia Constitution to be present in the courtroom[12] while the record was being "perfected" out of the presence of the jury. However, because other issues enumerated as error may occur on retrial, we address them.

---

[9] *Washington v. State*, 268 Ga. 598, 600 (492 SE2d 197) (1997); *Guess v. State*, 264 Ga. 335, 336 (443 SE2d 477) (1994).

[10] *Avery v. State*, 269 Ga. 584 (502 SE2d 230) (1998).

[11] Id.

[12] See Georgia Constitution of 1983, Art. I, Sec. I, Para. XII (guaranteeing the right of an accused to be present at all stages of trial); *Turpin v. Todd*, 271 Ga. 386 (519 SE2d 678) (1999).

## EVIDENCE OF PRIOR DIFFICULTIES.

3. Over objection of the defense, the state was permitted to offer the testimony of five witnesses regarding conversations they had with Shana about her prior difficulties with Slakman. None of the witnesses heard the disagreements or observed Slakman's actions which Shana described to them.

On appeal Slakman argues that the testimony of these witnesses was inadmissible hearsay. The state maintains that the testimony was admissible either as original evidence pursuant to OCGA § 24-3-2,[13] or pursuant to the "necessity" exception to the hearsay rule because of the unavailability of Shana and "particularized guarantees of trustworthiness."[14] Evidence of prior threats, quarrels or assaults by a defendant against a victim are admissible to show motive and intent.[15] However, where, as here, the evidence of prior difficulties is hearsay, it is not admissible unless it satisfies the criteria of OCGA § 24-3-2 or an exception to the hearsay rule.

(a) Pursuant to OCGA § 24-3-2, when the conduct and motives of an actor are relevant to the issues to be tried, "then information, conversations, letters and replies, and similar evidence known to the actor are admissible to explain the actor's conduct."[16] In this case Shana's conduct was not an issue. Nor were her conversations with these five witnesses regarding Slakman's statements or actions admissible pursuant to OCGA § 24-3-2 to explain Slakman's conduct,[17] particularly where there was no showing that Slakman was aware of these conversations.[18]

(b) The issue remains whether the testimony was admissible under the necessity exception to the hearsay rule. OCGA § 24-3-1 (b). The "necessity" of permitting hearsay is established because Shana is deceased,[19] and because the proffered testimony was more probative on the issue of motive than other evidence offered in the case.[20] However, unless the testimony also contained particularized guarantees of trustworthiness, it was not admissible.

(1) Two of Shana's co-workers who had known her for only a few

---

[13] The trial court admitted all the testimony at issue pursuant to OCGA § 24-3-2 which provides, "When, in a legal investigation, information, conversations, letters and replies, and similar evidence are facts to explain conduct and ascertain motives, they shall be admitted in evidence not as hearsay, but as original evidence."

[14] See, e.g., *McKissick v. State*, 263 Ga. 188 (429 SE2d 655) (1993).

[15] *Wall v. State*, 269 Ga. 506 (500 SE2d 904) (1998).

[16] *Dover v. State*, 250 Ga. 209, 212 (296 SE2d 710) (1982), cert. denied, 459 U.S. 1221 (103 SC 1228, 75 LE2d 462) (1983).

[17] 250 Ga. at 213; *Hooten v. State*, 256 Ga. 31, 33 (343 SE2d 481) (1986).

[18] *Jackson v. State*, 256 Ga. 536, 538 (350 SE2d 428) (1986).

[19] *Mallory v. State*, 261 Ga. 625 (2) (409 SE2d 839) (1991).

[20] *Chapel v. State*, 270 Ga. 151, 155 (510 SE2d 802) (1998).

months testified that Shana told them that she wanted a divorce from Slakman because he lied to her, hid bills from her, and mentally and verbally abused her.

We conclude that the requirement of particularized guarantees of trustworthiness has not been met as to these witnesses. In *Mallory v. State*,[21] and *Carr v. State*,[22] we held that the mere fact that the declaration by the deceased is made to a "confidante" or "dear friend" does not establish trustworthiness sufficient to admit the statement under OCGA § 24-3-1 (b). Shana had known both of these witnesses for only a short time before she began confiding in them about the problems in her marriage. It is possible that her statements to them were exaggerated or even false.[23] We conclude that the state did not provide a sufficient basis for the hearsay testimony of these witnesses.

(2) One of Shana's divorce attorneys testified that Shana stated that she wanted a divorce because Slakman was sneaky, opened her mail, lied to her, and humiliated her in public. Her other divorce attorney testified that she stated Slakman yelled and screamed after she told him she wanted a divorce. One of these attorneys had briefly met Shana on one occasion two weeks prior to her death and subsequently had two telephone conversations with her. The other attorney met her one time approximately three weeks before her death and appeared to have no other contact with her.

Considering the totality of the circumstances surrounding the making of the out-of-court hearsay statements, we conclude that the statements lack the "circumstantial guarantees of trustworthiness" required under this exception to the hearsay rule.[24]

(3) However, we hold that the testimony of Shana's mother possessed sufficient indicia of trustworthiness and was therefore admissible. There is nothing to show that Shana had any reason to lie to her mother. Instead, there was evidence that Shana trusted and confided in her mother above all others and sought her help and advice regarding marital problems.[25]

---

[21] Id.

[22] 267 Ga. 701 (3) (482 SE2d 314) (1997).

[23] See *Mallory v. State*, 261 Ga. at 628.

[24] See *Higgs v. State*, 256 Ga. 606 (351 SE2d 448) (1987); *Dix v. State*, 267 Ga. 429 (479 SE2d 739) (1997).

[25] *Roper v. State*, 263 Ga. 201, 203 (429 SE2d 668) (1993). We further noted in *Roper* that whether the witness has a reason to fabricate the declarant's statements goes to the credibility of the witness rather than to the admissibility of the witness's testimony. 263 Ga. 203, n. 3.

## EVIDENCE OF SIMILAR TRANSACTIONS.

4. (a) Over Slakman's objection the court admitted as similar transaction evidence the testimony of Slakman's first wife, Joan Olstein Reid, regarding his physical and verbal abuse of her during their marriage. In particular Ms. Reid testified that Slakman belittled and abused her; that he choked her after she told him she wanted a divorce; that she left the marital home after this attack; and that when she returned the following day to get her belongings, he again attacked and choked her. Ms. Reid testified that these incidents occurred between 1970 and 1974. The state argues that this evidence was admissible to prove a course of conduct: that Slakman attempted to control his wives and that he reacted violently when a wife told him she wanted a divorce. Slakman maintains that the trial court erred in admitting the incidents because they were too remote in time.

This Court has held that the passage of time is "one of the more important factors to weigh in considering the admissibility" of similar transactions evidence.[26] Should the state decide to retry this case, much of this evidence will be nearly 30 years old at the time the state seeks to admit it. We conclude that this evidence will be too remote[27] on retrial to be probative of Slakman's course of criminal conduct or state of mind.[28] A "substantial body" of case law supports our conclusion.[29]

This is particularly true since there was no evidence that Slakman physically abused his second wife during that marriage.[30] Thus there was a significant break in the "course of criminal conduct" which the state argues this evidence demonstrates,[31] further reducing the relevance of the remote act at issue.[32]

---

[26] *Mullins v. State*, 269 Ga. 157, 158 (496 SE2d 252) (1998).

[27] *Gillstrap v. State*, 261 Ga. 798, 799 (410 SE2d 423) (1991) ("It should be clear . . . that an event 31 years in the past is too remote" to be admitted as evidence of a similar transaction.).

[28] The trial court instructed the jury that it was to consider this evidence on the issue of Slakman's state of mind.

[29] See, Edward J. Imwinkelried, *Uncharged Misconduct Evidence* (Vol. II) § 8.08, and notes 25-42.

[30] In fact, as noted infra, a police detective testified that Slakman's second wife informed him Slakman did not physically abuse her during their marriage.

[31] Because we hold that the evidence of similar transactions testified to by Reid may not be admitted on retrial, it is unnecessary to decide whether the trial court erred in admitting as a prior consistent statement Reid's testimony that in 1991 she assisted in making a public service commercial about domestic violence in which she applied cosmetics to an actress to make her appear as Reid maintained she looked after Slakman beat her. Nor is it necessary to consider Slakman's claims regarding photographs of the actress in this commercial which were not admitted in evidence.

[32] Imwinkelried at § 8.08.

(b) The trial court denied the state's request to offer similar transaction evidence with regard to Slakman's second wife, Marcia Boaz. Ms. Boaz did not testify at trial. However, on cross-examination by the defense a police detective testified that Boaz had given him a statement that Slakman had not physically abused her during their marriage.

Slakman complains of the prosecutor's statement in closing argument that "Marcia Boaz was history before he ever got a shot at her, that's why she didn't show up" to testify at trial. Considered in context, the state was arguing that Marcia Boaz moved out of the marital residence and divorced Slakman before he had an opportunity to attack her. This argument was improper based on the evidence before the jury.

## THE INDICTMENT.

5. Slakman's challenge to the form of the indictment is precluded by his failure to challenge it prior to return of the verdict.[33] The indictment charged Slakman with crimes cognizable under Georgia law, was sufficient to place him on notice of the charges against him and to enable him to prepare an intelligent defense.[34] The indictment was not, as Slakman contends, void as a matter of law.[35]

We further conclude that the trial court's jury charge of the entire Code section on aggravated assault, in conjunction with its verbatim recital of the indictment, neither misled the jury nor violated Slakman's due process rights.[36]

## REMAINING ISSUES.

6. The trial court did not err in admitting a crime scene photograph of Shana,[37] pre-autopsy photographs,[38] or a post-autopsy photograph which established strangulation as a contributing cause of death.[39] Further, the state did not engage in prosecutorial misconduct during cross-examination of Slakman by showing him a crime scene photograph of Shana. Any error in the testimony of Shana's mother that Slakman had investigated her former husband was facilitated by defense counsel.[40] The trial court did not err in refusing to

[33] *Jones v. State*, 240 Ga. App. 484 (523 SE2d 73) (1999).
[34] Id. at 486.
[35] *Borders v. State*, 270 Ga. 804, 806 (514 SE2d 14) (1999).
[36] *Moses v. State*, 270 Ga. 127, 129 (508 SE2d 661) (1998).
[37] *Power v. State*, 260 Ga. 101, 103 (390 SE2d 47) (1990).
[38] *Rucker v. State*, 270 Ga. 431, 433-434 (510 SE2d 816) (1999).
[39] *Brown v. State*, 250 Ga. 862 (302 SE2d 347) (1983).
[40] During her cross-examination by Slakman's counsel, the victim's mother asked if she could make a statement. Defense counsel agreed and the witness made the statement to

allow defense counsel to comment in closing argument on that portion of Slakman's statement to police in which he offered to take a polygraph test absent a stipulation that results of the test would be admissible.[41] On retrial all references to a polygraph test should be redacted from Slakman's statement prior to offering it in evidence. The trial court did not err in denying Slakman's motion to sever the murder case from the aggravated assault on the police officer.[42] Any right Slakman may have to comment on the state's failure to produce certain witnesses at retrial is preserved by this Court's decision in *Morgan v. State*.[43] Last, because the judgment is reversed and a new trial ordered, we find it unnecessary to address Slakman's allegations that trial counsel was ineffective.

7. Other than claims relating to the indictment for aggravated assault on Danny Hendrix,[44] and the denial of his motion to sever,[45] Slakman does not challenge this conviction. The conviction for aggravated assault is affirmed.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Hunstein, Carley and Hines, JJ., who dissent.*

HUNSTEIN, Justice, dissenting.

I respectfully dissent to Division 2 of the majority's opinion reversing Slakman's conviction because of the introduction of testimony by the court reporter. Under well-established law, the testimony of the court reporter was admissible both as to what she herself heard Slakman state in her presence and as to the accuracy of the tape recording she had made of Slakman's statement. I also dissent to Division 3 regarding the evidence of prior difficulties and join Justice Hines' dissent to Division 4 (a). Because no other reversible error was committed in this case, I would affirm Slakman's conviction for the death of his wife. I concur fully in the majority's affirmance of Slakman's conviction for aggravated assault.

1. Contrary to the majority's position in Division 2, it is not error to allow statements caught on tape to be related to the jury by an ear witness to the statements. *Smith v. State*, 228 Ga. App. 144 (2) (491 SE2d 194) (1997); *In the Interest of L. R.*, 219 Ga. App. 755 (4) (466

---

which Slakman now objects. It is unlikely that this incident will be repeated at any retrial of this case.

[41] *Holland v. State*, 221 Ga. App. 821 (2) (472 SE2d 711) (1996); *Durham v. State*, 240 Ga. 203, 204 (3) (240 SE2d 14) (1977).

[42] *Dennis v. State*, 263 Ga. 257, 259-260 (430 SE2d 742) (1993) (trial court has a broad discretion to sever where evidence of one crime would be admissible in the trial of the other crime).

[43] 267 Ga. 203 (476 SE2d 747) (1996). The establishment of a right to argue this inference is, of course, "derived from evidence properly before the factfinder." 267 Ga. at 207.

[44] See division 5.

[45] See division 6.

SE2d 653) (1996). An audio recording does not constitute the "best evidence" of the statement since the law is well-established that the best evidence rule applies only to writings, not to electronic recording of sound waves upon magnetic tape. *Perkins v. State*, 260 Ga. 292 (7) (392 SE2d 872) (1990). It is equally well-established that in order to admit an audiotaped recording, the State must establish the accuracy and correctness of the conversations so recorded. *Johnson v. State*, 271 Ga. 375 (4) (519 SE2d 221) (1999); *Gambrel v. State*, 260 Ga. 197 (2) (391 SE2d 406) (1990). See also Daniel, Handbook on Criminal Evidence, § 9-16 (2000 ed.). To do so, our appellate courts have recognized that the foundation witness may testify that the tape is " 'the same as it was when it happened,' . . . [and] that the tape accurately depicts the event and any conversation that took place on the evening when he was with appellant." *Fields v. State*, 223 Ga. App. 569, 572 (3) (479 SE2d 393) (1996) (video).

In this case, Slakman made a statement within the hearing of the court reporter. The statement was also captured on the court reporter's audiotape equipment. The court reporter was called to the stand and testified before the jury to what she heard Slakman say. After the State established the foundational requirements for the admission of the audiotape, including the court reporter's testimony that the tape authentically reflected what was heard, the tape was played for the jury. On cross-examination, the defense questioned whether the court reporter had misheard Slakman's statement. On redirect, the prosecutor rephrased the foundational question he had asked earlier, to inquire whether the audiotape "verified" what the court reporter had heard. I cannot agree with the majority that this constituted impermissible "bolstering" since the witness' answer merely reiterated her earlier admissible testimony that the audiotape was accurate.[46]

There was no error in the admission of the court reporter's testimony regarding what she heard Slakman state in her presence even though there was an audiotaped recording of Slakman's statement. *Smith*; *In the Interest of L. R.*, supra. Contrary to the majority's assertion, these cases cannot be distinguished on the basis that the ear witness in this case was the court reporter since her testimony would carry no more "impact" than that of the police detective who testified to the statement captured on tape in *In the Interest of L. R.*, supra. I would reject as utterly without merit the contention that the

---

[46] The record reveals that the deputy sheriff called by the defense in rebuttal did not contradict the accuracy of the audiotape or the court reporter's testimony. Rather, he testified that he did not hear any initial comments Slakman may have made about what Slakman did, but only heard Slakman subsequently state twice "why did *they* do that to her."

witness' role during the trial as court reporter rendered her testimony inadmissible; it was Slakman's own behavior in uttering a statement in her presence which caused her to be a witness. There was no error in the witness testifying that the recording accurately reflected what she heard, as that testimony was not only admissible but essential in order to support the admissibility of the audiotape recording. *Gambrel*, supra. Finally, given that it is uncontroverted that no transcript of Slakman's audiotaped statement was used at any point during the trial, I find meritless Slakman's argument that the trial court was required to give instructions to the jury limiting their consideration to the audiotaped recording. The cases the majority relies upon are totally distinguishable from this factual situation, where the jury had before it for consideration only the testimony by witnesses who overheard Slakman's statement and the playing of the audiotaped recording itself. Indeed, the giving of such an instruction in light of the admissibility of ear witness testimony would have been highly inappropriate in this case.

2. Regarding Division 3, while I concur fully with the majority that there was no error in the admission of evidence of prior difficulties relayed by the victim to her mother, I disagree with the majority that the testimony by the victim's two attorneys was inherently untrustworthy and thus inadmissible for the reasons set forth in my special concurrence in *Dix v. State*, 267 Ga. 429 (479 SE2d 739) (1997). As I stated in that concurrence,

> I would assume that a client's statements made in the course of the attorney-client relationship are trustworthy given the presence of ample reasons for her to be accurate and truthful, in the absence of any evidence to establish a reason for a declarant to falsify her statements.

Id. at 433. Applying this standard to my review of the facts surrounding the victim's statements to the attorneys in this case, I would find that this evidence was admissible. Regarding the victim's statements to her co-workers, it is clear that even if the admission of this evidence was error, it was harmless given the cumulative nature of the evidence. *Felder v. State*, 270 Ga. 641 (8) (514 SE2d 416) (1999) ("[t]he erroneous admission of hearsay is harmless where, as here, legally admissible evidence of the same fact is introduced. [Cit.] In such a case, the hearsay is cumulative and without material effect on the verdict. [Cit.]" Id. at 646).

For the reasons stated above, I find that a reversal of Slakman's murder conviction is not necessary and thus I would affirm his convictions and sentences entered thereon.

I am authorized to state that Justice Carley concurs in this dis-

sent and Justice Hines concurs in Division 1 of this dissent.

HINES, Justice, dissenting.

The reversal of Slakman's murder conviction is unwarranted. The analyses contained in Divisions 2 and 3 of the majority opinion are problematic, but I am also concerned with the determination in Division 4 (a) that it was error for the trial court to permit Slakman's first wife, Reid, to testify about the physical and verbal abuse she endured at the hand of Slakman. The majority erroneously concludes that the violence, occurring between 1970 and 1974, was too remote in time, and therefore, inadmissible as a matter of law.

In *Gilstrap v. State*, 261 Ga. 798 (410 SE2d 423) (1991), this Court sanctioned the exclusion of similar transaction evidence on the basis that the event was 31 years in the past. However, subsequently, this Court plainly acknowledged that while the passage of time is certainly a significant factor to consider in assessing whether the conduct in question is admissible as similar transaction evidence, it alone is not determinative. *Mullins v. State*, 269 Ga. 157, 158 (2) (496 SE2d 252) (1998). Nor should it be, especially in cases involving domestic abuse, which are prone to patterns of conduct. See *Sapeu v. State*, 222 Ga. App. 509, 510 (4) (474 SE2d 703) (1996).

The focus of the inquiry on admissibility of the evidence is the similarity between the independent act and the crime for which the defendant is being tried in order that the trier of fact may make a reasoned determination whether the independent act is sufficiently similar to the charge being tried so as to be relevant. *Hudson v. State*, 271 Ga. 477, 479 (2) (521 SE2d 810) (1999). Here, similarity is undeniable. Slakman's slain wife died from severe trauma complicated by her being manually strangled after she informed Slakman that she was going to divorce him. It is beyond question that ex-wife Reid's testimony that Slakman attacked and choked her after she told him that she wanted a divorce was highly relevant on both the issue of Slakman's state of mind and his course of conduct in a marriage gone bad. The trial court did not err in admitting it.

I am authorized to state that Justice Hunstein and Justice Carley join in this dissent.

DECIDED JULY 14, 2000 —
RECONSIDERATION DENIED JULY 28, 2000.

*Steven E. Phillips*, for appellant.
*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Christopher M. Quinn, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General,*

*Wesley S. Wood, Assistant Attorney General*, for appellee.
*Nations, Toman & Nutter, David C. Nutter*, amicus curiae.