## S06A0820. SCOTT v. THE STATE.

(637 SE2d 652)

HINES, Justice.

Xzavier Scott appeals his convictions for felony murder while in the commission of cruelty to a child and giving false information to a law enforcement officer, in connection with the death of his daughter, Shaniya West. For the reasons that follow, we affirm in part and reverse in part.[1]

Construed to support the verdicts, the evidence showed that Shaniya West was the 13-month-old daughter of Scott and Tandi West. The three shared an apartment with Wandisia Buffington, Buffington's three-year-old son, and Buffington's boyfriend, James Nelems. On the day of Shaniya's death, West left for work, leaving Shaniya in Scott's care; Shaniya was healthy at that time. Buffington and her son were also in the apartment; Nelems had left for work.

---

[1] West was killed on June 23, 2001. On January 28, 2003, a Fulton County grand jury indicted Scott for malice murder, felony murder while in the commission of cruelty to a child in the first degree, cruelty to a child in the first degree, and giving false information to a law enforcement officer. Scott was tried before a jury on February 16-19, 2004, and found not guilty of malice murder, but guilty of all other charges. On February 19, 2004, Scott was sentenced to life in prison for felony murder, and twelve months to serve for giving false information to a law enforcement officer, which was "commuted" to time served; the charge of cruelty to a child in the first degree merged with the felony murder. See *Malcolm v. State*, 263 Ga. 369, 372-374 (4) (434 SE2d 479) (1993). Scott moved for a new trial on March 5, 2004, and amended his motion on May 18, 2005. The amended motion was denied on October 3, 2005. Scott filed his notice of appeal on October 10, 2005, the appeal was docketed in this Court on January 10, 2006, and submitted for decision on March 6, 2006.

Buffington awoke at approximately 11:00 a.m.; at 12:30 p.m., she briefly heard Shaniya crying upstairs, but did not see her. Buffington saw Scott once, when he came downstairs to speak with West on the telephone, shortly after Shaniya cried. Buffington next saw Scott at 2:50 p.m., when he left the apartment for the first time that afternoon to get West from work. West returned to the apartment that afternoon; Shaniya was not breathing normally. West asked Buffington to call 911. In addition to an ambulance, police officer Charles Cook responded to the call. Scott identified himself to Cook as "John Scott," Shaniya's father.

Shaniya was taken to a hospital and West and Scott followed. Scott told a physician that he left the apartment for 15 minutes to visit neighbors at 12:45 p.m. As the medical personnel suspected child abuse, police officers were called to the hospital. Cook was again one of the responding officers, and Scott again identified himself as "John Scott." At the hospital, Detective Edward Benefield asked Scott to make a statement at the offices of the Major Case Division of the police department. Cook drove Scott to the offices in a patrol car; Benefield drove separately. Shaniya later died.

Scott's statement to Detective Benefield was that: he awoke at 11:30 a.m., fed Shaniya, and went back to sleep; he awoke again at 1:30 p.m. to find Shaniya having trouble breathing; he telephoned West and told her that Shaniya was lethargic; West said to try to feed her again, and he responded that she would not stay awake long enough; he left the apartment at 2:50 p.m. to meet West at work, telling Buffington to watch the child; when West examined Shaniya, she decided to telephone for an ambulance. Scott told Detective Benefield that he did not leave the apartment between 11:30 a.m. and 2:50 p.m.

Medical evidence showed that Shaniya died of trauma to the brain, resulting from being struck on the head with an object, being forcefully struck against an object, or being violently shaken. She would have displayed signs of distress "within minutes" after these injuries were inflicted. Her body also revealed injuries to her ribs that were in the process of healing at the time of her death, and had been inflicted six to twelve weeks earlier; these were the result of Shaniya being severely squeezed.

1. Scott contends that the State presented only circumstantial evidence that did not exclude all reasonable hypotheses except that of his guilt. See OCGA § 24-4-6.

> [Q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence,

though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law. [Cit.]

*Robbins v. State*, 269 Ga. 500, 501 (1) (499 SE2d 323) (1998). The evidence was sufficient to enable a rational trier of fact to find Scott guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court denied Scott's motion to exclude his statement to the police. Scott asserts that this was error because the statement was not freely and voluntarily made, as it was given without the police first advising him of his *Miranda* rights.[2] "*Miranda* warnings are required when a person 'is (1) formally arrested or (2) restrained to the degree associated with a formal arrest.' [Cit.] Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary. [Cit.]" *Robinson v. State*, 278 Ga. 299, 301 (2) (602 SE2d 574) (2004). "On appeal, the issue is whether the trial court was clearly erroneous in its factual findings regarding the admissibility of the statements. [Cit.]" *Jackson v. State*, 272 Ga. 191, 193 (3) (528 SE2d 232) (2000).

At the hospital, Detective Benefield asked Scott if he would come to the police station and discuss the circumstances surrounding the incident. Scott was told that he was not being singled out, that Benefield would ask for statements from all the adults in the apartment; as West and Scott were the adults then available, Benefield thought it best to request Scott's statement first, leaving Shaniya's mother at the hospital. Scott was transported to the police station[3] in the rear seat of a police car with a security screen between the front and rear seats; he was not handcuffed. See *Gabriel v. State*, 280 Ga. 237, 237-238 (2) (626 SE2d 491) (2006). Both Cook and Benefield testified that it was normal procedure to drive a witness in a patrol car with such a screen if one was available; Benefield's car did not have such a screen. Similarly, before allowing Scott into the police car, Cook performed a pat-down for weapons. Cook testified that: this is always done for the officer's safety; he explained this fact to Scott; and

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[3] The unrebutted evidence was that while several police operations were managed from this building, it did not house a police patrol precinct and was virtually unmanned during the late-night interview with Scott.

that the procedure would have been the same had he picked up a stranded motorist. At all times, Scott appeared to be in full command of his faculties.

Cook testified that if Scott had asked to be let out while en route, Cook would have called Benefield for approval to do so; Benefield testified that if this had occurred, he would have tried to persuade Scott to cooperate and make a statement, but if Scott wanted to exit Cook's vehicle, "there's nothing I could do to stop him from going home." And, once at the station, had Scott asked to terminate the interview, Benefield would have given him a ride home.

Scott was interviewed in Benefield's office cubicle; no other officers were present. For a period of time, Benefield and Scott were in the office area staffed by the administrative assistant who transcribed Scott's statement. Scott signed a form that recited that his statement was given freely, "and without promise or reward, coercion, intimidation, or other unlawful influence." At no time did Scott indicate a reluctance to continue the interview or request to speak to anyone outside the building.[4] There is no error in the trial court's determination that a reasonable person in Scott's situation would not perceive himself to be in custody. See *Bell v. State*, 280 Ga. 562, 564 (2) (a) (629 SE2d 213) (2006); *Gabriel*, supra.

3. During the cross-examination of Buffington, Scott asked whether at any time prior to Shaniya's death, any of Buffington's six children had been removed from her custody; she responded that none had. He then asked if she had ever "had an allegation of abuse" brought against her; the State objected on the ground of relevance, and the jury was excused from the courtroom. After argument by counsel, the court ruled that it would not allow such questioning "at this time," but would allow further argument on the subject the next day. Upon the jury's return, the court instructed it that it was to disregard Scott's last question.

The next day, after further argument, the court ruled that cross-examining Buffington about any accusation or communications with the Department of Human Resources ("DHR") concerning Buffington's relationship with her children, and DHR's responses to any such accusation or communications, would be improper. The DHR forms that Scott proffered to the court indicate that a "friend of the family" asserted abuse by Buffington toward her then 23-month-old child, which included "beating the child, cussing at him and throwing him around"; Buffington was subsequently directed to take parenting classes, take her children to all medical appointments, and not to use

---

[4] After Scott gave his statement, efforts to confirm his identity revealed that he had provided the police officers with a false name, date of birth, and social security number.

harmful discipline on them. During voir dire on these matters, Buffington denied that she had been directed to take parenting classes.

Scott contends that allowing the desired questioning could have cast doubt on the State's case against him.

> Certainly a defendant is entitled to introduce relevant and admissible testimony tending to show that another person committed the crime for which the defendant is tried. *Henderson v. State*, 255 Ga. 687, 689 (1) (341 SE2d 439) (1986). However, the proffered evidence must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature. *Croom v. State*, 217 Ga. App. 596, 599 (3) (458 SE2d 679) (1995); *Bradford v. State*, 204 Ga. App. 568 (420 SE2d 4) (1992).

*Klinect v. State*, 269 Ga. 570, 573 (3) (501 SE2d 810) (1998).

A reasonable inference of a defendant's innocence is "raised by evidence that render[s] the desired inference more probable than the inference would be without the evidence." *Oree v. State*, 280 Ga. 588, 593 (5) (630 SE2d 390) (2006). Scott's proposed questioning of Buffington on cross-examination does this; he wished to show that the other adult in the apartment during the period of time that the fatal injuries were inflicted had a history of inappropriate behavior toward her own infant child, including an allegation of physically forceful abuse. He proffered forms with her signature on them to impeach her voir dire testimony that she had not been directed to take parenting classes as a result of the accusation. Further, Buffington was already connected to the corpus delicti; she was apparently the only other adult in the apartment when Shaniya's fatal injuries occurred, and a history of similar actions toward an infant would only connect her further. Id.; compare *Azizi v. State*, 270 Ga. 709, 714 (6) (512 SE2d 622) (1999).

The exclusion of this line of inquiry cannot be considered harmless. See *Oree*, supra. A crucial element of Scott's defense was that Buffington was a likely suspect in Shaniya's murder, and that the circumstantial evidence did not exclude the reasonable hypothesis that she was the true culprit. See OCGA § 24-4-6. While the evidence against Scott was legally sufficient to sustain his convictions even considering OCGA § 24-4-6, see Division 1, supra, the test for harmless error is whether it is "highly improbable" that the jury's verdict would have been different if the excluded evidence had been admitted. *Oree*, supra. Under these facts, it cannot be said that such a result

would be "highly improbable." Accordingly, Scott's convictions for felony murder and cruelty to a child must be reversed.[5]

As Scott's remaining enumerations of error could occur on retrial, we will address them. See *Slakman v. State*, 272 Ga. 662, 666 (2) (533 SE2d 383) (2000).

4. On direct examination, the State asked West if, when she first became romantically involved with Scott, she knew that he was married, and she responded that she did not. The State asked if she had ever talked to Scott about that, and Scott objected, challenging the relevancy of the questioning. The State announced that it "goes to the status of their relationship and goes to bias," and the trial court overruled the objection. West answered that she did not know Scott was married, the State then asked why she did not, and West responded that Scott had not told her. Scott then, outside the jury's presence, moved for a mistrial. In colloquy, the State attempted to justify the questioning by stating that it was not yet known whether Scott would be testifying, and if information about Scott's marital status was divulged, it wanted to place this information before the jury to forestall the jury assigning some blame to West in the matter. The State also said it would ask no more questions on the subject and the court stated that it did not believe a mistrial was necessary.

While Scott is correct that the questioning was irrelevant, a mistrial was not mandated. See *Stanley v. State*, 250 Ga. 3, 4 (2) (295 SE2d 315) (1982).

5. During closing argument, the State called the jury's attention to Scott's sole witness, noted that Scott did not have to present any evidence, and said: "in a murder case, if you are going to put something up . . . what are you going to put up? Well, you are going to put up the best piece of evidence you've got, right?" Scott objected, stated that he wished to make a motion, and the court excused the jury. Scott then argued that the argument was an attempt to shift the burden of proof to him.[6] The court did not err in denying Scott's motion for mistrial. See *Johnson v. State*, 271 Ga. 375, 383 (15) (a) (519 SE2d 221) (1999) (rejecting the contention that the State's "make them explain" argument was burden shifting).

*Judgments affirmed in part and reversed in part. All the Justices concur, except Carley and Melton, JJ., who dissent.*

MELTON, Justice, dissenting.

"[A] defendant is entitled to introduce relevant *and admissible* testimony tending to show that another person committed the crime

---

[5] This determination does not affect Scott's conviction for giving false information to a law enforcement officer.

[6] Scott did not assert that the State's argument was a comment on his failure to testify.

for which the defendant is tried." (Emphasis supplied.) *Klinect v. State*, 269 Ga. 570, 573 (3) (501 SE2d 810) (1998), citing *Henderson v. State*, 255 Ga. 687, 689 (1) (341 SE2d 439) (1986). While I agree that the fact that Wandisia Buffington had allegedly abused her own children in the past may have been relevant in this case, the only evidence of any such abuse proffered by Scott was inadmissible hearsay which the trial court properly excluded. Therefore, I must respectfully dissent.

To support the allegation of Buffington's past behavior, Scott proffered an "intake worksheet" used by DFACS to process incoming claims of abuse. This worksheet contained the allegations of Buffington's neighbor that Buffington had physically abused her children. The worksheet, itself, is hearsay, and the neighbor's statement, on which Scott relied to show prior physical abuse, constitutes hearsay within hearsay. As a general rule, hearsay within hearsay is inadmissible. See, e.g., *Harper v. State*, 152 Ga. App. 689, 690 (1) (263 SE2d 547) (1979). Scott provided no proffer to the trial court to overcome this prohibition and provide a basis for the admission of the neighbor's accusation as an exception to the rule against hearsay. He proffered no testimony from the DFACS employee who filled out the intake worksheet,[7] no testimony from the caseworker to whom the intake worksheet was assigned,[8] and no testimony from the neighbor who made the allegations. Accordingly, the accusation made by Buffington's neighbor is inadmissible double hearsay, and the trial court did not err by excluding it.

The majority nonetheless would reverse Scott's conviction because he was not allowed to impeach Buffington with DFACS processing forms which indicated that parenting courses had been recommended for Buffington. *McAllister v. State*, 258 Ga. 795 (375 SE2d 36) (1989), however, requires a different result. In *McAllister*, the defendant gave testimony regarding whether the victim made a certain phone call. The trial court then allowed the State to impeach the defendant's testimony using telephone company records which had not been shown by the State to be admissible under the business records exception to the rule against hearsay evidence. We found that the trial court erred in allowing the hearsay documents to be used for

---

[7] Even if Scott had attempted to introduce the intake worksheet and the neighbor's accusation under the business records exception to the hearsay rule, he could not have done so. To the extent that the intake worksheet "noted the contents of a conversation, not an act, transaction, occurrence, or event, the business records exception to the hearsay rule was inapplicable. [Cit.]" *Mitchell v. State*, 254 Ga. 353, 355 (5) (a) (329 SE2d 481) (1985).

[8] Although Scott did indicate that he had subpoenaed Deon Thomas, one of Buffington's caseworkers, Thomas was not Buffington's caseworker at the time that the accusations were made, and, in any event, Scott proffered no testimony from Thomas regarding the validity of the accusations made against Buffington.

impeachment, noting that, "[w]hile a prior inconsistent statement made by a witness may be used for impeachment, there is no general rule of law which allows all hearsay evidence to be used for impeachment." Id. at 797 (6), n. 2. As the State did in *McAllister*, the defendant in this case argues that he should have been allowed to impeach a witness with documents which he failed to show were subject to a hearsay exception. Such an impeachment procedure, however, is inappropriate, and the trial court properly disallowed it. Accordingly, Scott's conviction should be affirmed.

I am authorized to state that Justice Carley joins in this dissent.

DECIDED NOVEMBER 20, 2006 —
RECONSIDERATION DENIED DECEMBER 15, 2006.

*Thomas S. Robinson III*, for appellant.
*Paul L. Howard, Jr.*, District Attorney, *Bettieanne C. Hart, Marc A. Mallon*, Assistant District Attorneys, *Thurbert E. Baker*, Attorney General, *Edwina M. Watkins*, Assistant Attorney General, for appellee.