**SECOND DIVISION**
**ANDREWS, P. J.,**
**MCFADDEN and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 11, 2015**

# In the Court of Appeals of Georgia

A14A2073. HOWELL v. THE STATE.

A14A2074. HOWELL v. THE STATE.

RAY, Judge.

In two indictments, Thaddeus Octavius Howell was charged with various offenses involving acts of domestic violence. The indictments were later joined by consent and tried together in a single jury trial. Howell was convicted of false imprisonment (OCGA § 16-5-41), family violence battery (OCGA § 16-5-23.1 (a), (f)), interference with a 911 call (OCGA § 16-10-24.3), simple battery on a police officer (OCGA § 16-5-23 (a), (e)), and obstruction of a law enforcement officer (OCGA § 16-10-24) under the first indictment, and he was convicted of family violence battery (OCGA § 16-5-23.1 (a), (f)), aggravated assault (OCGA § 16-5-21 (b) (2)), and false imprisonment (OCGA § 16-5-41) under the second indictment.

Howell now brings two identical appeals from the trial court's denial of his motion for new trial, contending that the trial court erred (1) in permitting the court reporter to testify at the trial over his objection and (2) in charging the jury on aggravated assault. Finding no reversible error, we affirm Howell's convictions in Case No. A14A2073 and dismiss the identical appeal as redundant in Case No. A14A2074.

On appeal from a criminal conviction, the defendant no longer enjoys the presumption of innocence, and we view the evidence in the light most favorable to support the jury's verdict. *Weeks v. State*, 316 Ga. App. 448, 449 (729 SE2d 570) (2012).

The evidence showed that on the morning of December 4, 2010, Dawn Cloud was preparing to leave her house when Howell, who was Cloud's live-in boyfriend at the time, came home and an argument ensued. When Cloud asked Howell to leave, he struck Cloud in the back of her head, put her in a headlock, and choked her to the point that she could no longer breathe. Cloud attempted to call 911, but Howell snatched the phone away from her and broke it into pieces on the floor. After Cloud pressed the panic button on her car keys to activate her vehicle's horn alarm, Howell picked her up and "body-slammed" her onto the floor, wrestling the keys from her hands. Cloud attempted to get away, but Howell physically restrained her and said

2

"you're not going anywhere." During the incident, Cloud sustained visible injuries, including scratches to her hands and arms and red marks on her neck.

Cloud was later allowed to leave the residence, and she immediately called the police. The police officers who responded to the scene observed Cloud's injuries and obtained statements from both of the parties. Howell admitted that he and Cloud had been in a physical altercation that morning, but he could not explain how Cloud had received her injuries. When the officers advised Howell that he was under arrest, Howell resisted and got into a physical altercation with the officers, eventually kicking one of them. The officers were able to subdue Howell with a taser, and he was handcuffed and placed under arrest.

The evidence at trial further showed that in January 2012 Howell became involved in a romantic relationship with Lauren Holloway, eventually moving in with her. Although Holloway later ended the relationship, she maintained contact with Howell, and Howell kept a key to her residence.

On the night of April 19, 2012, Holloway accompanied Howell to a memorial service for one of his friends who had died in a motorcycle accident. Afterwards, they returned to Holloway's residence. In the early morning hours of April 20, 2012, Holloway informed Howell that she did not want to be with him anymore; she told

3

him to gather the rest of his clothing and personal effects that remained in the residence and to get out. Howell became upset and pushed her, chased her through the house, pushed her into a wall, grabbed her and threw her on the floor, and punched her in the face with his fist.

After Howell left, Holloway called the police to report the attack. When the responding officers arrived, Holloway told them what had happened, and the officers took photographs of her injuries.[1]

Howell knew that Holloway had contacted the police, and he sent several text messages to Holloway to tell her that he loved her. He later contacted Holloway to ask her what she had told the police.

On the morning of April 30, 2012, Holloway was asleep on the couch in her home when she awoke to find Howell on top of her. When Holloway got up to use the bathroom, Howell stood outside the bathroom door and asked her what she was doing, specifically asking her if she was calling the police. When she opened the door, Howell again asked her "What did you do? Did you call the police?"

Holloway then went to her living room to look for her keys so that she could leave. As she was opening the front door, Howell came up behind her and struck her

---

[1] Photographs of her visible injuries were admitted into evidence at trial.

on the side of her head with a handgun, knocking her down. Howell then grabbed her, pushed her onto the couch, put the gun to her head, and told her not to scream. After the situation calmed down, Holloway was able to get up and go to the bathroom to check on her head wound, which was swollen and bleeding. Howell followed Holloway to the bathroom to apologize, and Holloway begged him to "please get out before you kill me for real."

Howell eventually left the residence, and Holloway immediately went to the police station to report the attack. Photographs were taken of her head injury, which were admitted into evidence at trial. Following this incident, Howell continued to contact her to tell her that he loved her.

In a subsequent incident, Howell was following Holloway in his vehicle when he pulled up alongside Holloway's car, pointed a gun at her, and demanded that she pull over. Holloway slammed on her brakes, turned her car around, and drove away in the opposite direction. Howell managed to catch up to Holloway and side-swiped her car. After blocking her car to prevent her from driving away, Howell began shooting at Holloway's car. Although Holloway was not struck by any of the bullets, she did sustain injuries from the broken glass. Howell then drove away in his vehicle,

and Holloway called 911.[2] Photographs depicting her injuries and her damaged car were introduced at trial. Although Holloway obtained a protective order against Holloway the day after this incident, he continued to call her from jail to profess his love for her.

In addition to the above evidence, the State introduced similar transaction evidence from three other women to establish that Howell had a pattern of committing violence against women.

1. During the trial, the trial court took a recess during Holloway's testimony. Before the jury came back into the court room to continue with her testimony, the court reporter observed Howell silently "mouth" the words "I love you" to Holloway, who was sitting on the witness stand. Later, during cross-examination of Howell, the State asked him if he had done so, and Howell denied it. The trial court then allowed the State to call the court reporter to testify as a rebuttal witness over Howell's objection.[3] On appeal, Howell argues that the trial court erred when it permitted the court reporter to testify for the State. Specifically, he contends that (i) the court

---

[2] In the trial at issue here, Howell was not being prosecuted for any offenses that occurred during this incident.

[3] Another court reporter was called in to take down this testimony.

reporter's testimony constituted improper impeachment on a collateral matter, and (ii) that allowing the court reporter to testify impacted the integrity and impartiality of the proceedings. We find his arguments to be unpersuasive.

(a) As an initial matter, we note that Howell raised in his brief the additional argument that the State's questioning of Howell with regard to his silent gesture to Holloway during the recess was improper because it exceeded the scope of cross-examination. However, Howell did not raise this issue as an enumeration of error on appeal. Therefore, to the extent he is challenging the State's cross-examination, his argument provides no basis for appellate review. See *Brown v. State*, 310 Ga. App. 835, 835, n. 1 (714 SE2d 395) (2011) (providing that a party cannot expand his enumerations of error through argument or citation in his brief, and claims not enumerated as error will not be reviewed).

(b) Howell contends that the trial court erred in allowing the court reporter to testify as a rebuttal witness, arguing that the testimony constituted improper impeachment on a collateral matter. We disagree.

Although a witness may not be impeached because of a discrepancy in his testimony regarding a matter that is wholly irrelevant to the case, a witness may be impeached about a collateral issue that is indirectly material to the case. See *Moody*

7

*v. State*, 279 Ga. App. 440, 445 (5) (631 SE2d 485) (2006). If the jury believed that Howell told Holloway that he loved her just before she resumed her testimony, the jury could infer that Howell had intended to influence her testimony.[4] It is well-settled that "evidence of a defendant's attempt to influence or intimidate a witness can serve as circumstantial evidence of guilt." (Citations omitted.) *Kell v. State*, 280 Ga. 669, 671 (2) (a) (631 SE2d 679) (2006). Under the particular circumstances presented in this case, the issue of whether Howell made such a gesture to Holloway was not merely collateral, but was arguably relevant to the issue of guilt. Therefore, the court reporter's testimony on this issue was not improper.

Howell also argues the court reporter's impeachment testimony was inherently prejudicial because he was precluded by law from calling the judge and/or the bailiff as witnesses to rebut the court reporter's testimony. However, Howell has failed to establish prejudice because he has not shown that the judge or the bailiff possessed knowledge of facts that could have refuted the court reporter's testimony. Moreover,

---

[4] We recognize that a person's use of the phrase "I love you" does not necessarily mean that the person has an ominous or ulterior motive for making such a statement. Indeed, this type of gesture is a show of affection that is typically well received. However, because Howell denied making such a seemingly innocuous gesture, a reasonable inference could be drawn that he had an ulterior motive for making it -- i.e., that he had intended to influence her testimony.

Howell has not shown that there were no other witnesses in the courtroom who could have testified or that he was precluded from calling any other witnesses in rebuttal.

(c) Lastly, Howell contends that allowing the court reporter to testify on behalf of the State eradicated the integrity and fundamental fairness of the trial. We find no reversible error.

Howell cites *Slakman v. State*, 272 Ga. 662 (533 SE2d 383) (2000), for the proposition that a court reporter should not be allowed to testify as a witness in any proceeding in which she is also serving as the official transcriber of witness testimony because the jury would automatically perceive her as a credible witness. However, our Supreme Court's holding in *Slakman* did not paint this issue with such a broad brush.

In *Slakman*, the defendant, who was on trial for murdering his wife, made an alleged confession outside the presence of the jury during a recess in the proceedings. Although the defendant's statement was not transcribed, it was overheard by the court reporter and captured on her audiotape. As there was a legitimate factual dispute about the contents of the defendant's statement, the court reporter was permitted to testify as to the inculpatory version of the defendant's statement which she personally heard, and she then testified that her audiotape "verified" that version. Thereafter, the

audiotape was played for the jury. Id. at 664-665 (2). In reversing the defendant's conviction, our Supreme Court found that "because there was an audiotape of [the defendant's] statement from which the jury could make its own determination of what had been said, the court reporter should not have been permitted to testify as to what she heard or to testify that the audiotape 'verified' her testimony." (Footnote omitted.) Id. at 665 (2). The Court further found that the error was not harmless, considering the jury's perspective of the capacity in which the court reporter served at the trial *in conjunction with* the trial court's utter failure "[to] instruct the jury that it was to determine for itself what was recorded on the audiotape or the manner in which it was to resolve any discrepancies between the court reporter's testimony and the contents of the audiotape." Id. at 665-666 (2).

Here, by contrast, there was no recording of Howell's gesture to Holloway for the jury to evaluate. Furthermore, the court reporter did not improperly bolster her own testimony; she merely testified that she had observed Howell "mouth" the words "I love you" to Holloway during the recess. Most importantly, the trial court instructed the jury that it was to determine the credibility of the court reporter on the same basis as any other witness. Based on these facts, we believe that the trial court

10

acted properly within its discretion in allowing the court reporter to testify[5]. Even if it was error to allow the testimony, such error was harmless in light of the overwhelming evidence of Howell's guilt.

2. Howell contends that the trial court erred in charging the jury on aggravated assault when it instructed the jury that a handgun is a deadly weapon as a matter of law and failed to instruct the jury that the issue of whether the handgun constituted a deadly weapon in this case was solely a matter for its consideration. As Howell's trial counsel did not raise an objection to the trial court's charge, "the matter is subject only to plain error review on appeal." (Citations omitted.) *Givens v. State*, 294 Ga. 264, 266 (2) (751 SE2d 778) (2013) (citations omitted). See OCGA § 17-8-58 (b).

In order to reverse on the basis of plain error in this case, Howell must satisfy the burden of establishing all of the following elements: that the charge (or the failure to charge) was erroneous; that the error was obvious; and that the error likely affected the outcome of his trial. See *Johnson v. State*, 295 Ga. 615, 617-618 (2) (759 SE2d 837) (2014); *Shaw v. State*, 292 Ga. 871, 873 (2) (742 SE2d 707) (2013); *State v.*

---

[5] As Justice Hunstein similarly pointed out in her dissent in *Slackman*, supra at 673, it was (the Defendant's) own behavior in uttering the statement in (the court reporter's) presence which caused her to be a witness.

*Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). If Howell establishes all of these elements, we have the discretion to reverse "if the error seriously affects the fairness, integrity or public reputation of the proceedings below."(Citation omitted.) *Kelly*, supra. As our Supreme Court has noted, "[s]atisfying all four prongs of this standard is difficult, as it should be." (Citation and punctuation omitted.) Id.

In this case, the aggravated assault count of the indictment accused Howell of committing an assault . . . "with a deadly weapon, a handgun, when he struck Lauren Holloway in the head with [the] handgun[.]" In its instruction to the jury, the trial court correctly charged that the State had the burden of proving the material element that the assault was made with a deadly weapon, as alleged in the indictment. However, the trial court further charged the jury that "[a] handgun[,] when used as such[,] is a deadly weapon as a matter of law." Thus, it is argued, the later portion of the charge relieved the State of its burden to prove that the handgun, when it was used to strike Holloway, constituted a deadly weapon.

In *Byrd v. State*, 325 Ga. App. 24 (752 SE2d 84) (2013), a case in which the defendant was similarly charged with aggravated assault for striking the victim in the head with a handgun, we found that the defendant's trial counsel was ineffective for failing to object to the jury instruction that "[a] firearm, when used as such, is a

12

deadly weapon as a matter of law." Id. at 27-28 (2) (a). In so holding, we found that the charge was not applicable to the facts of the case because the handgun was not alleged to have been used in the ordinary manner in which a gun is used — i.e. by pointing the gun or using it to shoot at someone; it was alleged to have been used as an object to strike the victim. Id. at 28 (2) (a) In reversing the aggravated assault conviction, we found that there was a reasonable probability that, but for counsel's error, the outcome of the trial would have been different because there was absolutely no evidence to support a conclusion that the handgun had been used as a deadly weapon — i.e., no evidence of degree of force used, injury, likelihood of injury, or apprehension of injury. Id.

Here, by contrast, there was overwhelming evidence to establish that the handgun constituted a deadly weapon. The evidence was undisputed that Holloway was struck on the side of her head with the handgun so violently that it knocked her down and that the blow she sustained caused the side of her head to swell and bleed. Moreover, Holloway's perception of the degree of force that Howell had used against her was apparent because she immediately begged him to "please get out before you kill me for real." See generally *Ortiz v. State*, 292 Ga. App. 378, 381 (2) (665 SE2d 333) (2008) (where the evidence showed, without conflict, that defendant struck the

13

victim so hard with a handgun that it caused the victim's head and face to bleed and victim testified that feared he would be killed, the handgun was per se a deadly weapon).

Although we agree that the trial court's charge would have been error if it had stated that the use of a gun in committing an assault would always constitute an aggravated assault, this it did not do. The jury was told that the State must prove that the assault was with a deadly weapon and that a handgun could be one, depending on how it was used. The jury was free to decide either way. In any event, even if these instructions were erroneous, Howell has failed to establish that such error likely affected the outcome of his trial. *Kelly*, supra at 33 (2) (a). In other words, Howell has failed to show that, had the correct charges been given, it was likely that jury would have acquitted him of the aggravated assault charge. Moreover, in light of the overwhelming evidence of Howell's guilt, we find that the error did not seriously affect the fairness, integrity or public reputation of the proceedings.[6] Id.

---

[6] "Unlike a harmless-error analysis, where the appellee bears the burden of showing that an error did not likely affect the outcome below, a plain-error analysis requires the appellant to make an affirmative showing that the error probably did affect the outcome below." (Citation omitted.) *Wagner v. State*, 311 Ga. App. 589, 594, n. 3 (716 SE2d 633) (2011) (Blackwell, J., concurring specially). "[T]he hurdle to establishing plain error is high, . . . and . . . the failure to specifically articulate how the alleged error satisfies this high standard increases the likelihood that . . . claims in this regard will be rejected." *Kelly*, supra at 32 (1), n. 2.

As Howell has failed to satisfy the third and fourth prongs of the plain error analysis set forth in *Kelly*, supra and its progeny, we find no reversible error.

3. In Case No. A14A2074, Howell asserts the same errors as those asserted in Case No. A14A2073. We therefore dismiss Case No. A14A2074 as redundant. See *First Southern Bank v. C & F Services, Inc.*, 290 Ga. App. 305, 309 (5) (659 SE2d 707) (2008).

*Judgment affirmed in Case No. A14A2073, and Case No. A14A2074 is dismissed. Andrews, P. J., and McFadden, J., concur.*